*Whitehead v. Twentieth Century Fox Film Corp., Inc.*
CIVIL ACTION NO. 1:05-cv-01462-GK

# DECLARATION OF
# JEANETTE MELENDEZ BEAD

# EXHIBIT 3

Westlaw.

53 F.Supp.2d 38                                                                                                    Page 1
53 F.Supp.2d 38
(Cite as: 53 F.Supp.2d 38)

**H**

**Motions, Pleadings and Filings**

United States District Court,
District of Columbia.
David L. WHITEHEAD, Plaintiff,
v.
PARAMOUNT PICTURES CORPORATION, et al.,
Defendants.
No. Civ.A. 96-2436(PLF).

June 30, 1999.

Holder of copyright on book depicting his life, including employment by Central Intelligence Agency (CIA), sued distributors of motion pictures involving CIA, claiming Copyright Act and common law violations. Defendants moved for summary judgment. The District Court, Paul L. Friedman, J., held that: (1) film involving efforts of CIA to take over covert operations organization did not infringe book describing difficulties computer operator had with CIA; (2) film involving efforts to determine "mole" within CIA special action team did not infringe book; (3) claim of improper dissemination of copyrighted material, under District of Columbia law, was preempted by Copyright Act; (4) films did not invade privacy rights of claimant, under District of Columbia law; (5) distributors did not intentionally inflict emotional distress, in violation of District of Columbia Law; and (6) copyright infringement claims would be dismissed against individual employees of distributors, following determination that copyrights were not infringed.

Case dismissed.

West Headnotes

**[1] Copyrights and Intellectual Property** ⚷51
99k51 Most Cited Cases
To establish copyright infringement, a plaintiff must prove ownership of a valid copyright, and copying of constituent elements of the work that are original. 17 U.S.C.A. § 101 et seq.

**[2] Copyrights and Intellectual Property** ⚷83(3.1)
99k83(3.1) Most Cited Cases

In the absence of direct evidence of copying, a plaintiff may prove copying aspect of Copyright Act violation by establishing that defendants had access to the copyrighted work, and there was substantial similarity between the protectable material in plaintiff's and defendants' works. 17 U.S.C.A. § 101 et seq.

**[3] Copyrights and Intellectual Property** ⚷83(1)
99k83(1) Most Cited Cases
In order to establish required substantial similarity between copyrighted work and alleged infringer's works, for Copyright Act infringement purposes, a complainant must show that alleged infringer's works are substantially similar to elements of allegedly infringed work that are copyrightable or protected by the copyright. 17 U.S.C.A. § 101 et seq.

**[4] Copyrights and Intellectual Property** ⚷4.5
99k4.5 Most Cited Cases
No author may copyright ideas or the facts he narrates. 17 U.S.C.A. § 101 et seq.

**[5] Copyrights and Intellectual Property** ⚷12(2)
99k12(2) Most Cited Cases
Sequences of events in a story that necessarily result from the choice of setting or situations, known as "scenes a faire," and stock themes or settings that often arise in works of a particular genre, are not protected by copyright. 17 U.S.C.A. § 101 et seq.

**[6] Copyrights and Intellectual Property** ⚷51
99k51 Most Cited Cases
When a work for which copyright is claimed contains both protectable and unprotectable elements, a court must ascertain whether the protectable elements, standing alone, are substantially similar. 17 U.S.C.A. § 101 et seq.

**[7] Copyrights and Intellectual Property** ⚷51
99k51 Most Cited Cases
In determining whether the copyright in a work has been infringed, a court must examine not just the isolated protectable elements but the overall concept and feel of a work as well as any specific similarities. 17 U.S.C.A. § 101 et seq.

**[8] Copyrights and Intellectual Property** ⚷57

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 F.Supp.2d 38                                                                                           Page 2
53 F.Supp.2d 38
**(Cite as: 53 F.Supp.2d 38)**

99k57 Most Cited Cases
Motion picture involving Central Intelligence Agency (CIA) effort to take over private organization engaged in covert activities did not infringe book by former CIA employee who was computer operator describing problems encountered while working for CIA, even though protagonist in both was black male attractive to white females, prostitution was involved, and settings of both were major cities; items found in common were ordinary elements incapable of copyright, and overall tone of works was different. 17 U.S.C.A. § 101 et seq.

[9] Copyrights and Intellectual Property ⇐57
99k57 Most Cited Cases
Motion picture involving efforts of Central Intelligence Agency (CIA) employee to undercover "mole" within special action team did not infringe book by former CIA employee who was computer operator describing problems encountered while working for CIA, even though protagonists in both had dark hair and were attractive to females, both involved escape scenes, and main computer room of CIA was portrayed; items cited as similar were ordinary story elements incapable of copyright, and overall tone of works was different. 17 U.S.C.A. § 101 et seq.

[10] Copyrights and Intellectual Property ⇐89(2)
99k89(2) Most Cited Cases
Motion to delay summary judgment to allow for additional discovery would be denied in copyright infringement case; discovery was sought on question whether alleged infringer had access to copyrighted work, and court had already decided that copyrighted and allegedly infringing works were not similar. Fed.Rules Civ.Proc.Rule 56(b), 28 U.S.C.A.

[11] Copyrights and Intellectual Property ⇐109
99k109 Most Cited Cases

[11] States ⇐18.87
360k18.87 Most Cited Cases
To avoid preemption under Copyright Act, a cause of action defined by state law must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by federal copyright law. 17 U.S.C.A. § 101 et seq.

[12] Copyrights and Intellectual Property ⇐109
99k109 Most Cited Cases

[12] States ⇐18.87
360k18.87 Most Cited Cases
Claim that producers of motion picture films improperly distributed or disseminated copyrighted material, in violation of privacy rights accorded by District of Columbia law, was preempted by Copyright Act prohibition on unauthorized distribution of copyrighted work. 17 U.S.C.A. § 106(3).

[13] Torts ⇐387
379k387 Most Cited Cases
    (Formerly 379k8.5(6))
Motion picture producers did not invade privacy rights of claimant by distributing films allegedly based on claimant's life story; under District of Columbia law, invasion of privacy tort extended only to appropriation of name or likeness. Restatement (Second) of Torts § 652.

[14] Damages ⇐57.25(1)
115k57.25(1) Most Cited Cases
    (Formerly 115k50.10)
Intentional infliction of emotional distress claim, under District of Columbia law, based on alleged infringement of copyright, could not be sustained following determination that copyright was not infringed.

[15] Copyrights and Intellectual Property ⇐77
99k77 Most Cited Cases
Copyright infringement claims, against employees and agents of corporations allegedly distributing motion pictures that infringed copyright on book, would be dismissed following determination corporations had not infringed copyright. 17 U.S.C.A. § 101 et seq.

[16] Copyrights and Intellectual Property ⇐90(2)
99k90(2) Most Cited Cases
Trial court would exercise its discretion not to award attorney fees and costs to distributors of films, following dismissal of "patently frivolous" copyright infringement lawsuit which was one of several filed against producers of various films; claimant filed pro se complaint, and present action was one of first he filed. 17 U.S.C.A. § 505.

*40 Daniel Joseph Henry, Falls Church, VA, for plaintiff.

Gerson Avery Zweifach, Paul Benedict Gaffney,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Williams & Connolly, Washington, DC, for Paramount Pictures Corp., Pocket Books and Simon & Schuster, Inc.

Mark Leddy, Cleary Gottlieb Steen & Hamilton, Washington, DC, for Disney Corp., Touchstone Pictures, Buena Vista Video Pictures, Distribution and Columbia House Video Club.

Jeffrey William Kilduff, O'Melveny & Myers, LLP, Washington, DC, for Time Warner Entertainment Company, LP, Warner Books, Warner Brothers and Home Box OFfice.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

Plaintiff David L. Whitehead alleges that the film BAD COMPANY, the film MISSION: IMPOSSIBLE and the novelization of the film MISSION: IMPOSSIBLE all infringe on the copyright of his book *Brains, Sex, & Racism in the C.I.A. and the Escape.* He has sued a number of individual and corporate defendants allegedly involved with writing, filming, producing or distributing BAD COMPANY and MISSION: IMPOSSIBLE, and he seeks to recover damages pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.,* and various common law tort theories.

The corporate defendants have moved for summary judgment, arguing that Mr. Whitehead has failed to state a claim for violation of the Copyright Act and that the various common law claims either are preempted by the Copyright Act or fail to state a claim. Defendants Time Warner Entertainment, Warner Brothers, and Home Box Office also have moved to recover attorneys' fees and costs pursuant to the Copyright Act. *See* 17 U.S.C. § 505. Plaintiff responded by moving for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

Upon consideration of the works in question, the parties' submissions and the relevant law, the Court concludes that defendants' works are not substantially similar to plaintiff's work, and it therefore will grant defendants' motion for summary judgment on the Copyright Act claim. Plaintiff's motion for discovery will be denied because there is no additional discovery that defendants could provide to plaintiff that would bear on the issue of substantial similarity. Plaintiff's common law claims either are preempted by the Copyright Act or fail to state a claim upon *41 which relief can be granted, and those claims will be dismissed. Finally, while plaintiff's case clearly lacks merit, in view of plaintiff's *pro se* status, the Court will refrain from awarding attorneys' fees on this occasion.

I. BACKGROUND
A. *Mr. Whitehead's Book: Brains, Sex, & Racism in the C.I.A. and the Escape*

Mr. Whitehead's book, *Brains, Sex, & Racism in the C.I.A. and the Escape,* is an autobiographical account of his seven years with the Central Intelligence Agency and his foray into politics that followed. *See* Def. Walt Disney Co. Motion for Summ.J., Exh.A (Copy of *Brains, Sex, & Racism in the C.I.A. and the Escape* ). Mr. Whitehead briefly describes his childhood and his experiences as a college basketball player, Army reservist and member of the Navy before delving into a detailed narrative about his time at the CIA

In the book, Mr. Whitehead recounts that he began his work at the CIA in Virginia in 1983 as a communications specialist, and later worked as a computer operator. From the outset, he was discontented at the CIA; he believed that many of his supervisors and co-workers felt threatened by him because he is an intelligent, athletic black man to whom many women, in particular white women, were attracted. *Brains, Sex, & Racism* gives detailed descriptions of the many women with whom Mr. Whitehead had sexual relations or relationships or who he thought were attracted to him. From his descriptions, the women cover a broad spectrum; they are African American, white and Asian-American, lawyers, doctors, students and secretaries. All are described as beautiful.

Mr. Whitehead asserts that he worked hard for the CIA and performed his job extremely well, and he includes in the text of the book copies of many laudatory notes that he received. He nevertheless had a great deal of difficulty with other CIA employees, and the CIA refused to give him promotions. For instance, in July 1988, he was transferred to Chicago for a two-year term to work for the Office of Personnel as a recruiter. During his time in Chicago, he conducted interviews at colleges throughout the Midwest to recruit minorities to work for the CIA, but he says he experienced a great deal of difficulty with his co-workers and the "establishment" at the CIA. According to the book, he became ill from the stress of that environment, and he appears to believe that someone may have drugged the drinking water in his refrigerator. In

1989, despite what he thought was exceptional work, Mr. Whitehead was told that he was being removed from his assignment in Chicago short of his two-year term, and he was told to return to the Washington D.C. area. In January 1990, Mr. Whitehead decided that he could no longer tolerate the racism and stress at the CIA, and he submitted his resignation.

In February 1990, Mr. Whitehead undertook the "escape" of the book's title. CIA officials called Mr. Whitehead into the headquarters office for an emergency meeting and asked him to surrender his badge and credentials. According to the book, when he refused and instead ran out of the building, CIA officials chased him and called for security. Mr. Whitehead ran out of an emergency exit onto a ramp, and when he saw "security coming close with an old white lady leading the pack," he jumped off the ramp to the parking lot, got in his car and drove away. Immediately after that incident, Mr. Whitehead contacted several news agencies and newspapers about his story, but according to the book, the people that he contacted were afraid to pursue the story.

The book then goes on to describe Mr. Whitehead's foray into politics, and his unsuccessful bid to become a shadow senator for the District of Columbia. The book also details his contact with and views on various political figures including Mayor *42 Marion Barry and Reverend Jesse Jackson.

After completing his book, Mr. Whitehead submitted it to the CIA for preclearance, which he received. He obtained a copyright for *Brains, Sex, & Racism in the C.I.A. and the Escape* in April 1991. *See* Pl's Motion for Discovery and Opposition to Motion for Summ.J, Exh.H. (Certificate of Copyright). The book was published by Equality America Press in 1992.

### B. Defendants' Works
#### 1. *BAD COMPANY*

The film BAD COMPANY is described as a fictional "edge-of-your-seat ... sexy thriller." *See* Def. Walt Disney Co. Motion for Summ.J., Exh.C. (Videotape Copy of BAD COMPANY). The main character, Nelson Crowe (played by Laurence Fishburne), is an African American former CIA agent specializing in blackmail and bribery. Sometime before the film opens, he had lost his position with the CIA for allegedly stealing $50,000 that he was supposed to use to blackmail an Iraqi colonel. Crowe swears that he delivered the money to the colonel, but the colonel tells the CIA that he never received it. As the movie opens, Crowe is hired by The Grimes Organization, a for-profit company that hires former CIA agents to conduct a variety of espionage and covert operations for its clients. Victor Grimes (played by Frank Langella), the creator of The Grimes Organization, originally envisioned it as a "toolshed" or brain trust for former CIA operatives to use their skills and training from the CIA to benefit private clients. Most of the operations of The Grimes Organization are managed by Margaret Wells, an attractive, blonde "master spy and seductive manipulator" played by Ellen Barkin. *See id.*

Margaret Wells works with Crowe on his first assignment: setting up and photographing a corporate CEO having sex with his teenaged niece so that the CEO will lose his position. Crowe apparently completes the assignment to Wells' satisfaction. Wells then attends a meeting between Victor Grimes and the main client of The Grimes Organization at which Grimes, Wells and the client decide to bribe a judge who has significant gambling debts and who is sitting on a case with major ramifications for the client.

Wells shows up at Crowe's apartment at 2:30 in the morning and rouses him from sleep to tell him about the plan to bribe the judge. She also tells Crowe that she wants to kill Victor Grimes so that she can take over The Grimes Organization. She promises Crowe half the control and profits of the organization if he will help her eliminate Grimes. Crowe agrees. The two then begin a passionate sexual relationship that continues through much of the movie.

Back at The Grimes Organization, Crowe and Tod Stapp, another African American former CIA agent employed by The Grimes Organization, begin laying the groundwork for bribing the judge. Victor Grimes gives Crowe a bag containing one million dollars in bribe money. Crowe takes the bag, but instead of immediately contacting the judge, Crowe detours to see his former CIA supervisor, Agent William Smithfield ("Smitty"), played by Michael Murphy, and it becomes apparent that Crowe is still working with Smitty and the CIA.

The audience now learns that instead of firing Crowe for allegedly stealing the money that he was supposed to deliver to the Iraqi colonel, Smitty has used the allegations and the threat of criminal prosecution to force Crowe to accept a most difficult and dangerous assignment: to help him take over The Grimes Organization so that the CIA can use the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

highly trained operatives in Grimes' toolshed. Smitty has forced Crowe to infiltrate The Grimes Organization to carry out this mission. After Crowe tells Smitty of the plan to bribe the judge, Smitty instructs Crowe to follow through with the bribe and then to *43 report back to Smitty for further instructions.

Crowe meets the judge, played by David Ogden Stiers, at the home of the judge's lover, Julie Ames. Crowe tells the judge that he will give him one million dollars if the judge will vote a certain way on the case involving Grimes' client. Otherwise Crowe threatens to go to the press and reveal that the judge is heavily indebted with gambling debts. The judge succumbs and accepts the money.

Meanwhile, Tod Stapp has discovered that Crowe actually is operating as an agent of the CIA. Crowe tells Stapp of the plan to eliminate Victor Grimes and to install Margaret Wells as the head of The Grimes Organization. He tells Stapp that after Grimes is eliminated, The Grimes Organization will become a part of the CIA. He offers Stapp a place in the organization if Stapp agrees to keep the plan and Crowe's work with the CIA secret. Stapp agrees, and he and Crowe go to see Smitty. Smitty instructs them to go back to the judge and bribe him to vote the opposite way so that Victor Grimes' influence with his main client will be undermined, making Grimes vulnerable. Crowe agrees, but then changes his mind, apparently because he knows that he and Margaret Wells are planning to kill Victor Grimes.

In the meantime, the judge has been overcome by guilt. After giving the bribe money to his lover and instructing her to deposit it in an account in her name, he commits suicide. Margaret Wells then lures Victor Grimes on a trip, and Crowe enters the house while Wells and Grimes are having sex and murders Grimes. After seeing Grimes murdered, Wells appears to have second thoughts, and she looks to Crowe apparently for some compassion. But Crowe is concerned with covering up the murder, and he beats Wells and ties her up to make it look as though an intruder both beat her and killed Grimes.

After her release from the hospital, Margaret Wells takes control of The Grimes Organization. Although she and Crowe still are working together, their relationship has deteriorated and she no longer trusts him. Shortly thereafter, Smitty visits Wells in her office, tells her that the CIA has decided to take control of The Grimes Organization, and asks her to run the organization for the CIA. If she does not cooperate, he threatens to criminally prosecute her for bribing the judge and murdering Grimes. Smitty also instructs her to eliminate Crowe.

Wells immediately goes to Crowe's apartment. In the elevator on the way up to Crowe's apartment, Wells sees the judge's lover, Julie Ames, who has come to kill Crowe for his part in the judge's death. Once both Wells and Ames are in Crowe's apartment, Ames tries to shoot Wells and Crowe, but she misses both of them. Wells and Crowe then grab their guns and simultaneously shoot one another. Both are killed. Ames gathers evidence of the CIA's involvement with The Grimes Organization from Crowe's apartment and, as the movie closes, sends the information to the United States Attorney's Office.

### 2. *MISSION: IMPOSSIBLE*

The film and the novelization of MISSION: IMPOSSIBLE are fictional, action-packed thrillers, loosely based on the old television series about the Impossible Mission Force (IMF), a team of highly-trained secret agents within the CIA. *See* Def. Paramount Picture's Motion for Summ.J., Exh. 2 (Videotape Copy of MISSION: IMPOSSIBLE); Exh. 4 (Copy of Novelization of MISSION: IMPOSSIBLE). The latest mission of the IMF is to film a spy named Golitsyn in the act of stealing a list of the CIA's undercover agents from the United States embassy in Prague. The team is told that the spy is stealing the list to sell it to a shadowy Czech arms dealer named Max. IMF leader Jim Phelps, played by Jon Voight, carefully briefs the team on the assignment, and he warns them that if the list is stolen and sold to Max, the lives of many undercover agents will be lost.

*44 The mission begins as planned, and the team films Golitsyn stealing the list. As the mission unfolds, however, something goes wrong. Master of disguise Ethan Hunt, played by Tom Cruise, hears and sees the other members of the IMF team killed one by one. Through his wristwatch television, he witnesses what he believes is Phelps' murder at the hands of an unknown gunman. Golitsyn also is murdered, and Hunt realizes that the list has been stolen.

Hunt calls his CIA supervisor and meets him so that they can arrange Hunt's safe passage back to the United States. At that meeting, Hunt learns that the mission was a "mole hunt," a mission set up to identify a traitor. The CIA had suspected for some time that someone on the IMF team had been selling

secrets to Max, and it set up the mission to try to catch the mole. The stolen list actually was a fake. As the sole known survivor of the mission, Hunt realizes that the CIA thinks that he is the mole. To avoid capture by CIA agents, he throws a stick of explosive bubble gum and flees to the secret meeting place of the IMF team.

Hunt realizes that the only way to clear his name and avenge the deaths of his fellow agents is to capture and expose the real traitor. As Hunt tries to think of a way to make contact with Max, Claire Phelps (played by Emanuelle Beart), a member of the ill-fated IMF team and the wife of team leader Jim Phelps, shows up at the meeting place. She also has survived the ill-fated mission, and she tells Hunt that she wants to help him avenge the deaths of the other team members.

Hunt makes contact with and meets Max, provocatively portrayed by Vanessa Redgrave. He convinces her that the list of undercover agents that she bought from the mole is phony. Max agrees that she will reveal the traitor's identity if Hunt will provide her with the real list. Hunt concocts a scheme to steal the genuine list of agents from the only place it exists: a high-security computer room in the CIA's Langley, Virginia headquarters. He recruits a team of other disavowed CIA agents to conduct this mission, including Claire Phelps. The team successfully executes an intricate plan to gain access to the high-security room and download the list. Hunt and his team then travel to London to meet Max.

Once in London, Phelps, the team leader of the ill-fated Prague mission whose murder Hunt thought he had witnessed, contacts Hunt. Phelps tells Hunt that the head of the CIA's covert operations is the traitor, but Hunt realizes that Phelps in fact is the IMF traitor. In the final scene, Hunt and his team are on a speeding train traveling from London to Paris. They meet Max there and give her a list of agents, but they use computer technology to frustrate her ability to access the list. Max tells Hunt that the traitor is on the train. As Hunt prepares to confront Phelps, the traitor, he discovers that Phelps' wife Claire, who has been working with Hunt's team of disavoweds and with whom Hunt had been falling in love, also is a traitor. The plot climaxes as Hunt foils Phelps' escape atop the speeding train. Phelps is killed and Hunt is a hero.

II. SUMMARY JUDGMENT STANDARD

Mr. Whitehead has sued Time Warner Entertainment, Warner Brothers, Home Box Office, the Walt Disney Company, Walt Disney Pictures and Television, ABC, Columbia House, and a number of individual defendants allegedly associated with the film BAD COMPANY. He has sued Paramount Pictures, Simon and Schuster, Pocket Books, and a number of individual defendants allegedly associated with the film MISSION: IMPOSSIBLE and the novelization of that film. [FN1] He alleges copyright *45 infringement under the Copyright Act, 17 U.S.C. § 501, et seq., mental pain and suffering, intentional infliction of emotional distress, "misappropriation of intellectual ideas," and "improper distribution and dissemination of copyright material (Privacy Act Violation)." See Amended Complaint at 16. [FN2]

> FN1. By separate Order, the Court has denied plaintiff's motion for leave to file a second amended complaint.
>
> FN2. The amended complaint also alleged race discrimination, but the Court dismissed that count. See Memorandum Opinion and Order of November 22, 1996.

The Court already has dismissed ten of the individual named defendants. See Memorandum Opinion and Order of November 22, 1996. The Court stayed the case against the remaining individual defendants pending briefing of motions for summary judgment filed by Paramount Pictures, Simon and Schuster, Pocket Books, Time Warner, Warner Brothers, Home Box Office, the Walt Disney Company, Walt Disney Pictures and Television, ABC, and Columbia House. See id; Order of November 27, 1996. The case now is before the Court on the motions for summary judgment of those defendants.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id. at 255, 106 S.Ct. 2505*; see also *Washington Post Co. v. U.S. Dept. of Health and Human Services, 865 F.2d 320, 325 (D.C.Cir.1989)*.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff's complaint was filed *pro se*. Complaints filed without the assistance of counsel are held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P.; Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in his favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C.Cir.1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50, 106 S.Ct. 2505.

### III. COPYRIGHT INFRINGEMENT

Mr. Whitehead alleges that defendants Time Warner Entertainment, Warner Brothers, Home Box Office, the Walt Disney Company, Walt Disney Pictures and Television, ABC, and Columbia House (the "BAD COMPANY defendants") infringed his copyright by making and/or distributing the film BAD COMPANY, and that defendants Paramount Pictures, Simon and Schuster, and Pocket Books (the "MISSION: IMPOSSIBLE defendants") infringed his copyright by making and/or distributing the film MISSION: IMPOSSIBLE and by publishing the novelization of the film MISSION: IMPOSSIBLE. The Court concludes that Mr. Whitehead has failed to establish substantial similarity between his book and any of the works at issue here. Judgment therefore will be entered for defendants on Mr. Whitehead's copyright infringement claims.

[1] To establish copyright infringement, a plaintiff must prove (1) "ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *46Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); see Stenograph L.L.C. v. Bossard Assoc., Inc., 144 F.3d 96, 99 (D.C.Cir.1998). In this case, the first element is not in dispute. Mr. Whitehead has submitted a certificate of copyright, see Pl's Motion for Discovery and Opposition to Motion for Summ. J, Exh. H. (Certificate of Copyright), and a certificate of copyright constitutes *prima facie* evidence of ownership of a valid copyright. See Stenograph L.L.C. v. Bossard Assoc., Inc., 144 F.3d at 99.

[2] With respect to the second element, in the absence of direct evidence of copying a plaintiff may prove copying by establishing (1) that defendants had access to the copyrighted work, and (2) the substantial similarity between the protectible material in plaintiff's and defendants' works. Williams v. Crichton, 84 F.3d 581, 587 (2nd Cir.1996); see 4 NIMMER ON COPYRIGHT § 13.03 [A] (1997). Mr. Whitehead has provided no direct evidence of copying, so he has the burden of establishing both substantial similarity and access. [FN3]

> FN3. Some courts have analytically separated this inquiry into two stages: first a showing of "copying" and then a showing of "infringement." Under that framework, plaintiff first must demonstrate copying by establishing "*probative* similarity" of the works and access. If plaintiff can establish copying, he then has the burden of showing infringement by establishing *substantial* similarity of the works. See, eg., CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1513 (1st Cir.1996).
> Under either formulation, plaintiff ultimately must establish substantial similarity. Since "a showing of substantial similarity will necessarily include the lesser showing of probative similarity," the Court will follow those courts that combine the copying and infringement inquiries and require only a showing of substantial similarity and access. Twin Peaks Productions v. Publications Int'l. Ltd., 996 F.2d 1366, 1372 n. 1 (2nd Cir.1993).

[3][4] The substantial similarity inquiry is somewhat complicated by the fact that in order to establish substantial similarity between plaintiff's work and defendants' works, a plaintiff must show that defendants' works are substantially similar to elements of plaintiff's work that are *copyrightable* or *protected* by the copyright. The mere fact that a publication is copyrighted does not mean that every part of it is protected. See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 348, 111 S.Ct. 1282; Rogers v. Koons, 960 F.2d 301, 307 (2nd Cir.) ("that a whole work is copyrighted does not mean that every element of it is copyrighted; copyright protection extends only to those components of the work that are original to the creator"), *cert denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Because "the *sine qua non* of copyright is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

originality," "no author may copyright ideas or the facts he narrates." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. at 345, 111 S.Ct. 1282 (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). Ideas and facts contained in copyrighted works therefore are not protected even though the creative expression of those ideas or facts may be. See *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. at 348; *Nelson v. Grisham*, 942 F.Supp. 649, 652 (D.D.C.1996), *aff'd*, 132 F.3d 1481 (D.C.Cir.1997), *cert. denied*, 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998). As Judge Boudin explained for the First Circuit, "the underlying idea (e.g., the travails of two star-crossed lovers), even if original, cannot be removed from the public realm; but its expression in the form of a play script (such as William Shakespeare's Romeo and Juliet) can be protected. Needless to say, the line is a blurry one." *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir.1998).

[5] Similarly, sequences of events that "necessarily result from the choice of setting or situations," known as *scenes a faire,* and stock themes or settings that often arise in works of a particular genre also are not protected. See *Williams v. Crichton*, 84 F.3d at 587; *Nelson v. Grisham*, 942 F.Supp. at 653. For instance, *47 the use of a police car chase in an action movie is not copyrightable, although the way a particular car chase is depicted may be copyrightable. As the Ninth Circuit has expressed it, "[D]epictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young people on one hand, and conservative or evil bureaucracies on the other [are] unprotectible. These familiar scenes and themes are among the very staples of modern American literature and film. The common use of such stock ... merely reminds us that in Hollywood, as in the life of men [and women] generally, there is only rarely anything new under the sun." *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985).

[6][7] Courts use various methods to "isolate the protectible expression" in the copyrighted work in order to determine whether there are substantial similarities between that protected expression and the defendant's work. *Matthews v. Freedman*, 157 F.3d at 27. When a work contains both protectible and unprotectible elements, the Court must ascertain whether "the *protectible elements, standing alone,* are substantially similar." *Williams v. Crichton*, 84 F.3d at 588 (emphasis in original) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2nd Cir.1995)). At the same time, when comparing the works the Court must recognize the danger of so dissecting a work "as to classify all its elements as unprotectable ... thereby possibly blind[ing it] to the expressiveness of their ensemble." See *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1515 (1st Cir.1996) (internal quotation omitted). The Court therefore must examine not just the isolated protectible elements but the overall "concept and feel of a work" as well as any specific similarities. See *Williams v. Crichton*, 84 F.3d at 589; *Nelson v. Grisham*, 942 F.Supp. at 653.

Upon extensive review of Mr. Whitehead's book and defendants' works, the Court concludes that the alleged similarities do not concern any protectible element of Mr. Whitehead's book and that no reasonable trier of fact could find the works substantially similar. Summary judgment therefore will be granted. See *Williams v. Crichton*, 84 F.3d at 587 (summary judgment appropriate if "similarity concerns only noncopyrightable elements of plaintiff work, or no reasonable trier of fact could find the works substantially similar") (internal quotations omitted); *Nelson v. Grisham*, 942 F.Supp. at 652 (summary judgment appropriate "where the works are so dissimilar that a claim of infringement is without merit") (internal quotations omitted). [FN4]

> FN4. Because the Court concludes that Mr. Whitehead has failed to establish substantial similarity, it does not need to reach the issue of access. See *Nelson v. Grisham*, 942 F.Supp. at 652 (question of access "ultimately irrelevant" where plaintiff cannot establish substantial similarity).

### A. Alleged Similarities Between Plaintiff's Work and BAD COMPANY

[8] Plaintiff lists several hundred points that he contends establish similarity between *Brains, Sex, & Racism* and BAD COMPANY. See Amended Complaint at ¶¶ 43-56; Pl's. Motion for Discovery and Opp. to Motions for Summ.J., Exh. Pt. 2. Virtually every similarity between BAD COMPANY and Mr. Whitehead's book that Mr. Whitehead identifies either is not at all similar or is an element that is not copyrightable because it is a fact, an idea or a *scene a faire.* While Mr. Whitehead's lists of alleged similarities are too extensive to review point by point, the Court has reviewed all of the items on his lists and finds that none of them establishes similarity. [FN5] In addition, and even more *48 importantly than reviewing his lists, the Court has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

read Mr. Whitehead's book and watched the movie BAD COMPANY. *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2nd Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *Nelson v. Grisham*, 942 F.Supp. at 652-53. [FN6] The Court finds that no reasonable observer could find them substantially similar beyond the level of *extremely* abstract and non-protectible ideas. The Court discusses the general categories of alleged similarities below.

> FN5. Most of the similarities alleged by Mr. Whitehead are too patently frivolous for discussion. For instance, he asserts that the works are similar because both use the phrases "kind of cute" and "what the f___ is this" and the words "tool," "Jesus," "coup" and "brother." *See* Pl's Motion for Discovery and Opp. to Motion for Summ.J., Exh. Pt. 2. Needless to say, the isolated use of a word or phrase such as "kind of cute" is not copyrightable.

> FN6. Completely apart from the legal issues in this case, the laborious plot contortions of the movie BAD COMPANY did not provide either Ellen Barkin or Laurence Fishburne with the opportunity to display the talent they have shown in other roles. *Compare* BAD COMPANY *with* SEA OF LOVE; *Pee Wee's Playhouse* (Cowboy Curtis); BOYZ 'N THE HOOD.

### 1. *Characters*

Plaintiff's main argument is that the central character in BAD COMPANY, Nelson Crowe, is copied from his autobiographical account of himself in *Brains, Sex, & Racism*. He notes that both characters are black and both were employed by the CIA where they experienced trouble in their positions. Both are described as intelligent, aggressive and athletic. Both men date a white woman with blond hair, both hold a bachelor's degree in political science and both took a personality test.

These shared abstract and general character traits do not make the two characters similar for purposes of copyright analysis. *See Williams v. Crichton*, 84 F.3d at 589. Race, intelligence, aggressiveness, paranoia and athleticism are not copyrightable traits. Similarly, the mere fact that both men worked for the CIA is not a copyrightable element, especially since their experiences with the CIA were so markedly different. Mr. Whitehead worked as a communications specialist, computer operator and recruiter. He was never a covert agent, and he remained a relatively low level employee throughout his time at the CIA. Ultimately, he was constructively discharged. The fictional character Nelson Crowe, by contrast, was a high level agent specializing in blackmail and bribery. His work compelled him to undertake secretive and morally offensive assignments, including murder. At the beginning of BAD COMPANY the audience is led to believe that Crowe has been fired from his CIA position, but it is later revealed that he was not; rather he retained his position with the CIA until his death at the end of the film.

Mr. Whitehead also contends that Crowe is similar to him because Crowe's personality test reveals that he is slightly paranoid while Mr. Whitehead is described in his book as slightly paranoid. It is quite common, however, for CIA agents and other covert operatives, especially those who experience tensions with the CIA administration, to be depicted in books and films as slightly paranoid, and slight paranoia in this context is a non-copyrightable *scene a faire*. *See Walker v. Time Life Films, Inc.*, 784 F.2d at 50 ("foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction. As such, they are not copyrightable").

In addition, the manifestations of Mr. Whitehead's and Nelson Crowe's respective paranoias are vastly different. Crowe is determined in a personality test to be slightly paranoid, but his behavior throughout the film is appropriately cautious given the cut-throat, double-crossing environment in which he operates. By contrast, Mr. Whitehead manifests paranoia beyond mere cautiousness appropriate to his surroundings. For example, he recounts visiting his orthodontist after he *49 was constructively fired from the CIA: "I asked her to take my braces off after wearing them for four years because I couldn't afford for the government to place communications devices in my braces. Without my doctor knowing it they could easily change her dental wires, and target my movements and sound with overhead satellites." *Brains, Sex, & Racism in the C.I.A. and the Escape* at 163.

Mr. Whitehead also contends that he and Nelson Crowe are similar because each has a sexual relationship with a blond, white woman. The general concept of an interracial relationship, like the idea of "two star-crossed lovers," however, is not copyrightable. *See Matthews v. Freedman*, 157 F.3d at 27.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Whitehead attempts to draw other parallels between Tiger, one of the many women he dated in his book, and Margaret Wells, Crowe's love interest in BAD COMPANY. He contends that they are similar because both are blond women who wear red dresses in one scene. Blond women in red dresses are ubiquitous images in movies of every genre; there is no sense in which the presence of a woman in a red dress, whether blond or brunette, constitutes copyright infringement.

Tiger and Margaret Wells are not even remotely similar characters. Tiger worked for the Department of State at the time Mr. Whitehead dated her. She is one of many women whom Mr. Whitehead describes in his book. According to him, the two went on several dates, but she broke up with him because she wanted a relationship in which she could have children, quit her job and stay at home and raise the children. Margaret Wells is not a stay-at-home type of woman. She is driven, ruthless and power-hungry. She is a central character in the film, second only to Nelson Crowe himself. She executes a plot to have her boss, Victor Grimes, killed. And in the end, she kills and is killed by Nelson Crowe. The characters in the movie simply bear no similarity to the protected elements of the characters in Mr. Whitehead's book.

### 2. *Plot and Setting*

Mr. Whitehead points to a number of what he regards as common plot lines between the two works. The Court concludes, however, that all of these constitute non-copyrightable concepts or ideas. For instance, he notes that both works depict prostitution. Prostitution is a common theme that occurs in many films and books; prostitution as a general concept is not a copyright protectible element. See *Walker v. Time Life Films, Inc.*, 784 F.2d at 50 ("[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen [and] therefore are unprotectible"). The specific way in which prostitution arises in the two works is drastically different. In BAD COMPANY, The Grimes Organization sets up an official by paying his niece to have sex with him. Wells and Crowe videotape the act, and the tape is then used to blackmail the official. By contrast, in *Brains, Sex, & Racism* Mr. Whitehead explains that he dated a woman named Yo who he discovered was a prostitute when he received a call late one night asking him to post bond for her. There is nothing similar about these two references to prostitution.

Mr. Whitehead also maintains that the settings of the two works are similar because each takes place in a major city on a lake front with tall buildings. In fact, plaintiff's work is set predominantly in Virginia, the District of Columbia, and Chicago, Illinois, while BAD COMPANY is set in Seattle, Washington. Furthermore, the particular settings of individual scenes are not at all similar. Most of the events in *Brains, Sex, & Racism* take place in CIA offices, CIA headquarters in Langley, Virginia or while Mr. Whitehead was on the road at universities and hotels as part of his recruiting position. The action in BAD COMPANY occurs primarily in the shadowy, minimalist offices of The Grimes Organization or in Crowe's apartment. Neither the *50 plot nor the setting of the two works is at all similar.

### 3. *Overall Feel and Concept of the Works*

Finally, while Mr. Whitehead attempts to draw similarities between the most minuscule elements of the two works, the works as a whole are entirely dissimilar. See *Williams v. Crichton*, 84 F.3d at 590 (list emphasizing "random similarities scattered throughout the works" does not support finding of substantial similarity where works as a whole are not substantially similar); *Nelson v. Grisham*, 942 F.Supp. at 653-54 ("In determining substantial similarity, courts must consider both the works as a whole and their individual parts ... 'just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different'") (quoting *Warner Brothers v. American Broadcasting Co.*, 720 F.2d 231, 243 (2nd Cir.1983)). *Brains, Sex, & Racism* is a non-fiction account of the personal tensions that Mr. Whitehead experienced over a series of years as a relatively low-level CIA desk employee. It gives a detailed, meandering narration of his day-to-day life, including his social and sexual interactions outside of work. Mr. Whitehead often interrupts the storyline to expound upon a conspiracy theory that he espouses or to give his view on the current events of the day. Finally, there is no element of suspense to the book; Mr. Whitehead advises the reader of milestones in his life well in advance of their chronological treatment.

By contrast, BAD COMPANY is a fictional suspense thriller. The complexity of its plot is built on the element of surprise. For example, the audience is initially led to believe that Crowe was fired from the CIA when, in fact, the opposite is true--his CIA supervisors blackmail him so that he cannot leave their employ even though he would like to.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, the movie is fast-paced, covering a much shorter time-span than Mr. Whitehead's book. A thorough review of the book *Brains, Sex, & Racism* and the film BAD COMPANY reveals that no reasonable jury could find any substantial similarity between the two works. The motion for summary judgment of the BAD COMPANY defendants therefore will be granted.

*B. Alleged Similarities Between Plaintiff's Work and MISSION: IMPOSSIBLE*

[9] As with BAD COMPANY, Mr. Whitehead lists many points that he contends establish similarity between *Brains, Sex, & Racism* and MISSION: IMPOSSIBLE. *See* Amended Complaint at ¶¶ 57-67; Pl's. Motion for Discovery and Opp. to Motions for Summ. J., Exh. Pt. 1. The Court has viewed the movie and reviewed the novelization. [FN7] As with BAD COMPANY, Mr. Whitehead has failed to establish substantial similarity. [FN8]

> FN7. While the movie had special effects beyond any in the original television show, the Court missed the presence of Peter Graves, Barbara Bain, Martin Landau and Greg Morris.
>
> FN8. The film MISSION: IMPOSSIBLE and the novelization of that film are essentially identical and will be treated as one work for purposes of determining substantial similarity.

*1. Characters*

Mr. Whitehead argues that the main character in MISSION: IMPOSSIBLE, Ethan Hunt, is modeled after him. He notes that both have short black hair, both are in their early thirties, both are considered slightly paranoid, intelligent, patriotic and athletic. Women are attracted to both. Both grew up in a rural setting, hold a master's degree and received CIA training. Pl's Motion for Discovery and Opp. to Defs.' Motions for Summ. J., Exh. Pt. 2. General characteristics such as black hair, intelligence, patriotism and slight paranoia, however, are not copyrightable and do not establish substantial similarity. *See supra* at 18.

*51 Mr. Whitehead and the fictional character Ethan Hunt are not remotely similar beyond these most general abstractions. A great portion of Mr. Whitehead's book is dedicated to exploring the particular issues he faces as a black man. He discusses the racial prejudice he believes he has experienced, especially at the CIA. Ethan Hunt is white--he is played by Tom Cruise--and at no point in either the book or the film does the character feel he is the victim of prejudice because of the color of his skin. In addition, Mr. Whitehead was a communications specialist, computer operator and recruiter who worked exclusively within the United States in what could be described as desk jobs. Hunt, by contrast, is a highly trained international operative who engages in fantastical, death-defying feats of physical prowess.

*2. Plot and Setting*

Mr. Whitehead argues that various plot developments running through MISSION: IMPOSSIBLE are copied from his book. For instance, because *Brains, Sex, & Racism* examined a theory that CIA Director Casey faked his death, Mr. Whitehead asserts that the faked deaths in MISSION: IMPOSSIBLE are copied from his book. A faked death, however, is not a copyrightable concept. *See Matthews v. Freedman*, 157 F.3d at 27. It is only the unique expression of that concept that is copyrightable, and the development of the general theme of faked deaths is entirely different in the two works.

Mr. Whitehead's work contains the following discussion regarding Director Casey. "There are three major theories: (1) that he really died, (2) that the agency killed him at his request or at the request of the Government, or (3) that [Casey] was transferred out of the country or to a secret hideout in the United States. I personally pick number three." *Brains, Sex, & Racism in the C.I.A. and the Escape* at 56. That is the entire sum of Mr. Whitehead's discussion of Director Casey's alleged faked death.

In MISSION: IMPOSSIBLE, an undercover agent feigns death as part of a trap set for a corrupt Russian politician, and later in the film the character Jim Phelps, who is revealed to be a mole, fakes his own death to escape blame for the murder of IMF agents he arranged and executed in the Prague mission. The faked deaths in MISSION: IMPOSSIBLE bear no resemblance to the conspiracy theory discussed in *Brains, Sex, & Racism* and cannot support a claim of substantial similarity.

Mr. Whitehead also maintains that many of the scenes in which MISSION: IMPOSSIBLE characters escape from dangerous situations are similar to the escape described in his book. He is incorrect. Escape scenes are common in action movies, and Mr. Whitehead does not hold exclusive rights to the existence of an escape scene in a book or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

movie. See *Walker v. Time Life Films, Inc.*, 784 F.2d at 50. The escape scenes in MISSION: IMPOSSIBLE bear no resemblance to Mr. Whitehead's self-described "escape." After Mr. Whitehead had quit his job at the CIA, he was called into CIA headquarters and his supervisors asked him to surrender his credentials and badge. After he refused to return his credentials and badge, he thought that his supervisors were going to come after him, and he ran out of the building. He remembers being chased by a "little old white lady," and he jumped off a loading platform, got into his car and drove away. *Brains, Sex, & Racism in the C.I.A. and the Escape* at 139-40. By contrast, MISSION: IMPOSSIBLE depicts super-human, life-threatening escapes with high-technology equipment.

Mr. Whitehead also asserts that the stories are similar because both involve a drugging. In MISSION: IMPOSSIBLE, the computer technician who operates the high-security computer room at the Langley headquarters is drugged by a member of Hunt's team to allow the team time to enter the computer room without the worker being present. In *Brains, Sex, & Racism,* Mr. Whitehead describes experiencing *52 sudden physical illness that drives him to have his health examined at a hospital emergency room. He concludes that he must have been drugged. These incidents are so dissimilar and serve such different functions in the development of the respective storylines that they cannot support a finding of substantial similarity.

Mr. Whitehead also maintains that the setting of MISSION: IMPOSSIBLE is similar to the setting of his book. For instance, the description of the computer room at the Langley, Virginia CIA site in MISSION: IMPOSSIBLE is similar to the description he gives of CIA headquarters in his book. He notes that both require special identification to enter. The Langley facility, however, is a real place that Mr. Whitehead attempted to describe in a factually accurate way. The layout of the Langley, Virginia headquarters of the CIA is a matter of fact that is not subject to copyright protection. See *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. at 348, 111 S.Ct. 1282. To the extent that there is any similarity, it is the result of the fact that both are depicting the same place, not the result of copying.

### 3. *Overall Feel and Concept*
Finally, the works are not similar because the total concept and feel of MISSION: IMPOSSIBLE bear no resemblance to Mr. Whitehead's book. See *Williams v. Crichton*, 84 F.3d at 590; *Nelson v. Grisham*, 942 F.Supp. at 653-54. MISSION: IMPOSSIBLE is a fast-paced action thriller that features gadgetry more advanced than the most cutting-edge technology. The physical stunts in MISSION: IMPOSSIBLE would be impossible to survive in the real world. The movie and novelization also rely on an element of suspense. Much of the action takes place overseas, and the characters are super-human, skilled intelligence agents. As discussed above, *see supra* at 22, *Brains, Sex, & Racism* is a meandering non-fiction narrative that bears no similarity to MISSION: IMPOSSIBLE.

In view of the fact that the works are so entirely different, it is unnecessary to continue in detail to address the alleged similarities listed by Mr. Whitehead. See *Nelson v. Grisham*, 942 F.Supp. at 653-54. Suffice it to say that the works are not similar, and the motion for summary judgment of the MISSION: IMPOSSIBLE defendants therefore will be granted. [FN9]

> FN9. As with the similarities alleged between Mr. Whitehead's book and BAD COMPANY, most of the alleged similarities between MISSION: IMPOSSIBLE and Mr. Whitehead's book approach the ridiculous. For example, Mr. Whitehead contends that the works are similar because they depict the following ideas or concepts: fog, a man with long hair, a fat man, overtime pay, high technology equipment at the CIA, wearing a tuxedo shirt, attractive women, working on a computer, classified information, being tired at the end of the day and not interested in talking, one character looking another character in the eye, one character screaming at another, and travel to Canada.

### C. *Plaintiff's Rule 56(f) Motion*
[10] Plaintiff has moved for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Plaintiff primarily seeks discovery on the issues of (1) defendants' access to his book, and (2) the relationships among the various corporate defendants so that he can determine which entities can properly be held liable for the alleged infringement. See Pl's Motion for Discovery and Opp. To Motions for Summ. J. at 1-3. These two areas of discovery are irrelevant to the analysis of substantial similarity on the basis of which the Court is granting summary judgment. Since the Court has found that there is no substantial similarity between defendants' works and Mr. Whitehead's book, it need not reach the issue of whether Mr. Whitehead has established that

defendants had access to his book. Discovery on the issue of access is irrelevant and will be denied. *See Nelson v. Grisham*, 942 F.Supp. at 652 (question of access "ultimately irrelevant" where plaintiff cannot establish substantial similarity). Similarly, since the Court has found that defendants' works do not infringe Mr. Whitehead's copyright, discovery *53 on the issue of which corporate defendant could be held liable for infringement is irrelevant.

The only request for discovery that even arguably relates to the substantial similarity inquiry is Mr. Whitehead's request for "a correct and complete and properly numbered shooting script" for MISSION IMPOSSIBLE. Mr. Whitehead contends that some of the lines in the script differ slightly from the words uttered in the movie. The Court has both examined the shooting script of MISSION IMPOSSIBLE provided by defendants, *see* Def. Paramount Pictures' Motion for Summ. J., Exh. 3, and watched the movie. It finds that the shooting script fairly represents the movie. While there may be slight differences between the final shooting script and the movie--for instance, an actor may have uttered a line slightly differently from the way it was written in the script--the shooting script is a substantially accurate representation of the lines uttered by the actors in the movie. Especially given the total absence of similarity between Mr. Whitehead's book and the movie, an absolutely accurate shooting script would have done nothing to help Mr. Whitehead establish substantial similarity. His request for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure therefore will be denied.

### IV. PLAINTIFF'S REMAINING CLAIMS

Mr. Whitehead's complaint alleges four other counts: (1) "misappropriation of intellectual ideas;" (2) "improper distribution and dissemination of copyright material (Privacy Act Violation);" (3) intentional infliction of emotional distress; and (4) mental pain and suffering." *See* Amended Complaint at 16. All four of these claims either fail to state a claim or are preempted by the Copyright Act, 17 U.S.C. § 101, *et. seq.*, and therefore will be dismissed.

[11][12] The Copyright Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title. [After January 1, 1978], no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301. "To avoid preemption, a cause of action defined by state law must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by federal copyright law." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir.), *cert. denied*, 510 U.S. 965, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993). *See Data General v. Grumman Systems Support*, 36 F.3d 1147, 1164 (1st Cir.1994). Mr. Whitehead's allegation that defendants improperly distributed and disseminated his work clearly is preempted by the Copyright Act, since unauthorized distribution of a copyrighted work is explicitly covered by the Copyright Act. *See* 17 U.S.C. § 106(3).

[13] The misappropriation claim, construed liberally, appears to be based on the notion of an invasion of Mr. Whitehead's right to privacy. [FN10] The District of Columbia courts have adopted the Restatement (Second) of Torts § 652 for invasion of privacy torts. *See Vassiliades v. Garfinckel's*, 492 A.2d 580, 587 (D.C.1985). Even if Mr. Whitehead could establish that either of the movies was based on his life story, which he cannot, there is no tort for invasion of privacy for appropriating the story of another person's life. *See Matthews v. Wozencraft*, 15 F.3d 432, 438 (5th Cir.1994) ("The narrative of an individual's life, standing alone, lacks the value of a name or likeness that the misappropriation tort protects"); *cf. Vassiliades v. Garfinckel's*, 492 A.2d at 587. Mr. Whitehead *54 therefore has failed to state a claim for misappropriation.

> FN10. Mr. Whitehead alleges a "Privacy Act Violation" in connection with his improper distribution claim, but it appears that the claim of a "Privacy Act Violation" is an attempt to allege the tort of misappropriation for invasion of privacy.

[14] Mr. Whitehead's claim for intentional infliction of emotional distress also fails. He appears to base this claim on defendants' alleged infringement of his copyright. Because he has failed to establish infringement, however, he fails to state a claim for intentional infliction of emotional distress. Finally, damages for mental pain and suffering are not actionable without an underlying cause of action. Since Mr. Whitehead has not sufficiently alleged any other cause of action, he cannot recover for mental pain and suffering.

### V. REMAINING DEFENDANTS

[15] Mr. Whitehead has sued a number of individual defendants allegedly associated with the production or distribution of the films BAD COMPANY and

MISSION: IMPOSSIBLE or with the writing or distribution of the novelization of MISSION: IMPOSSIBLE. The claims against the individual defendants are identical to those asserted against the corporate defendants discussed above. The Court stayed the case against the individual defendants pending briefing of and decision on the motions for summary judgment filed by the corporate defendants. See Memorandum Opinion and Order of November 22, 1996.

Since the causes of action against the individual and corporate defendants are identical and are premised on the same theory--that the films BAD COMPANY and MISSION: IMPOSSIBLE and the novelization of the film MISSION: IMPOSSIBLE infringed the copyright of Mr. Whitehead's book--there is no point in requiring the individual defendants to brief and argue the same issues already briefed by the corporate defendants. Mr. Whitehead has had notice and an opportunity to put forth all of his evidence to oppose summary judgment on these claims. His evidence simply is insufficient. Summary judgment therefore will be entered *sua sponte* for the remaining defendants. See Celotex Corp. v. Catrett, 477 U.S. at 326, 106 S.Ct. 2548 (courts have power to enter summary judgment *sua sponte*, "so long as the losing party was on notice that [he] had to come forward with all of [his] evidence"); Athridge v. Rivas, 141 F.3d 357, 361 (D.C.Cir.1998) (same).

### VI. DEFENDANT'S MOTION FOR ATTORNEYS' FEES AND COSTS

[16] Finally, defendants Time Warner, Warner Brothers, and Home Box Office have requested an award of attorneys' fees and costs pursuant to 17 U.S.C. § 505. See Motion for Summary Judgment at 3. Under the Copyright Act, the Court in its discretion may "allow the recovery of full costs by or against any party.... [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. While attorneys' fees and costs should not be awarded as a matter of course, they are equally available to prevailing plaintiffs and to prevailing defendants in actions under the Copyright Act. See Fogerty v. Fantasy, Inc., 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

This case is patently frivolous, and Mr. Whitehead's claims are objectively unreasonable. The case therefore presents a very strong one for an award of attorneys' fees and costs to the defendants. See Fogerty v. Fantasy, Inc., 510 U.S. at 534 n. 19, 114 S.Ct. 1023 (court may consider variety of factors including frivolousness, motivation and objective unreasonableness) (citing Lieb v. Topstone Industries, Inc., 788 F.2d 151, 156 (1986)). Moreover, it appears that some sort of sanction such as an award of attorneys' fees and costs may be necessary to deter Mr. Whitehead from filing additional frivolous actions. Mr. Whitehead now has filed nine actions, including this one, alleging copyright infringement. One of them alleges that a number of movies and books, ranging from the movie TITANIC to the book *How Stella Got Her Groove Back*, infringe his copyright *55 of *Brains, Sex, & Racism in the C.I.A. and the Escape*. See Civil Action No. 98-2938. In separate actions, he alleges that two other movies have infringed this same copyright of *Brains, Sex, & Racism*: the movie ERASER, SEE Civil Action No. 97-0752, and the movie THE NET, see Civil Action No. 97-0752. Mr. Whitehead also has filed three separate actions alleging that various movies have infringed the copyright he holds for a short story he wrote about Mike Tyson. See Civil Action No. 98-0256; Civil Action No. 98-0257; Civil Action No. 98-1917.

The Court will not exercise its discretion to award attorneys' fees in this case, primarily because Mr. Whitehead filed this complaint *pro se*, and this is one of the earlier copyright actions that he filed. Mr. Whitehead should be advised, however, that if the other cases currently pending before this Court are as completely lacking in merit as are the claims in this action, the Court very well may award attorneys' fees and costs to the defendants in those actions. An Order and a Judgment consistent with this Opinion shall be issued this same day.

SO ORDERED.

### ORDER

For the reasons stated by the Court in its Opinion issued this same day, it is hereby

ORDERED that the motion of defendants Time Warner Entertainment Co., L.P., Warner Brothers, and Home Box Office for attorneys' fees and costs is DENIED; and it is

FURTHER ORDERED that plaintiff's motion for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure is DENIED.

SO ORDERED.

### JUDGMENT

For the reasons stated by the Court in its Opinion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 F.Supp.2d 38  
53 F.Supp.2d 38  
**(Cite as: 53 F.Supp.2d 38)**

Page 15

issued this same day, it is hereby

ORDERED that the motion of defendants Paramount Pictures Corp., Simon and Schuster, Inc., and Pocket Books for summary judgment is GRANTED; it is

FURTHER ORDERED that the motion of defendants Time Warner Entertainment Co., L.P., Warner Brothers, and Home Box Office for summary judgment is GRANTED; it is

FURTHER ORDERED that the motion of defendants Walt Disney Co., Walt Disney Pictures & Television, ABC, Inc., Columbia House Co. for summary judgment is GRANTED; it is

FURTHER ORDERED that summary judgment is GRANTED *sua sponte* for the remaining defendants; it is

FURTHER ORDERED that all other pending motions not resolved by Orders issued this same day are DENIED as moot; it is

FURTHER ORDERED that JUDGMENT is entered for all defendants; and it is

FURTHER ORDERED that this case is DISMISSED and the Clerk of the Court shall remove it from the docket of the Court. This is a final appealable order. *See* Rule 4(a), Fed.R.Civ.P.

SO ORDERED.

53 F.Supp.2d 38

**Motions, Pleadings and Filings (Back to top)**

• _____1:96CV02436_____ (Docket) (Oct. 21, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.