*Whitehead v. Twentieth Century Fox Film Corp., Inc.*
**CIVIL ACTION NO. 1:05-cv-01462-GK**

# DECLARATION OF
# JEANETTE MELENDEZ BEAD

# EXHIBIT 6
# (Part A)

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
CIVIL DIVISION
Small Claims and Conciliation Branch

DAVID L. WHITEHEAD,

　　　　　Plaintiff

v.

DEWAYNE WICKHAM, *ET AL.*,

　　　　　Defendants

Small Claims No. 15207-04
Magistrate Judge Goodbread

## MEMORANDUM ORDER

*"All my best thoughts were stolen by the ancients."*
– Ralph Waldo Emerson (1803-1882)

*"Everything of importance has been said before by somebody who did not discover it."*
– Alfred North [*uh-oh!*] Whitehead (1861-1947)

At least insofar as this Court can tell, in his ninety-fourth civil action and merely his most recent claim for infringement of copyright, Plaintiff Whitehead has filed this case against the lead Defendant herein, author of the book *Bill Clinton and Black America* (New York: Ballentine Pub. Group, 2002), and its publisher's parent company, Random House of New York.[1]  Mr. Whitehead asserts that the book violates his federally-recognized copyright on a paper that he had previously written, entitled "Bill Clinton and the Negroes."  Having now read the Whitehead paper, the Court would characterize it as a collection of compositional roughage

---

[1] This bulk of this book, in actuality, is not as much Mr. Wickham's own writing as it is a collection of the results of interviews with numerous other prominent authors and luminaries in the civil rights field, including such personages as Joseph Lowery, Kweise Mfumui, Mary Frances Berry, Donna Brazile, Robert L. Johnson, Johnnie Cochran, Charles Ogletree, Alvin Poussaint, Jesse Jackson, Jr., and with the former President himself.

that does nothing to thrust its author into the front ranks of the *literati*.[2]

No matter that Whitehead's claim is one that arises under the Federal

---

[2] Other than an apparent generic similarity of concept in the titles, there is no comparison between these works. The paper itself (dated March 1, 2002) is 14 pages in length, consisting of 84 "paragraphs," 51 of which are comprised of 1 sentence each and another 20 of which have only two sentences each. Whitehead's line of thought – such as it is – in this *bon mot* skips like a flat stone skimming over the surface of a small pond, touching down here and there among completely random and unrelated points, barely making a ripple on the surface of any thought-provoking notion. Selected samples of direct quotations from the paper representative of its caliber of writing are the following (unedited and as written) – with the undersigned's proffered "categories" for each:

**Vocabulary Range:**  [Sen. Gary] Hart had razor sharp intellect, he was politically astute on domestic and international issues, a natural orator, keen leadership skills, etc. etc. (p.3)
**Built-in Redundancy:** ABC news Goodmorning America discussed Clinton's long speech at length. (p. 6)
**Insightful Analysis:**  Clinton's problem for 1992 would be Jesse Jackson. Therefore, the question for Clinton would be how to defeat Jackson for the 1992 nomination. (p. 6)
**Country Boys:**  Ironically, both Clinton and Jackson came out of the same mold. (p. 7)
**Sentence Fragments:** A very complicated mission. (p.7)
As Sgt. Samuel Doe taking over the palace. (p. 9)
As far as CIA is concerned in this matter examined the Bush, Clinton, Bush arrangement around the White House. (p. 10)
**Don't Ask, Don't Tell:** Jackson received arousing support from the military for his role when he recused the Naval war prisoner Goodman from the Syrians. (p.7)
**That's "Tah":** A coup de tat, resulting in establishing the psyche of the new leader in town, a Batman's joker (Jack Nicholson) with Prince's music. (p. 9)(*See also* Sentence Fragments.)
**Difficult Delivery:** Some believe that he [Clinton] fathered a black child in Arkansas having sex with a black female prostitute. (p. 9)
**The Fertile Bi-centenarian.** With current recognition of the Estate of Thomas Jefferson fathering children of Sally Hemings, there is nothing new under the sun. (p. 10)

The undersigned, who in a "previous life" has graded his share of college papers and law school exams (and helped grandchildren through similar tasks), would barely give this paper a passing grade for even junior high school work; it merits no more than a pallid D – in itself a pure gift for a paper that is filled with sentence fragments, comma splices, improper punctuation, misplaced and absent apostrophes, malapropisms, unintended double *entendres*, barren of any insight, lacking in clarity and cohesion, and having no clear thesis.  To coin a phrase, it is "deeply superficial."

Copyright Statute and therefore lies solely in a U.S. District Court; no matter that he has been sanctioned for similar frivolous lawsuits and appeals by at least two federal courts; no matter that he has nevertheless filed in the D.C. Superior Court in its function as a "State-level" court – and in its Small Claims Branch at that – and no matter that the latest Defendant has assured him that, dismissed or not, the case will be removed to the U.S. District Court here.   Nevertheless, Mr. Whitehead stolidly presses on, consciously creating obstacles as he goes along.

First, after a long "career" of trenchant litigation over previous copyright claims, he filed in this Branch of the Superior Court, knowing full well from his previous vast litigation experience over the same issue in four federal courts that this Court had no subject matter jurisdiction over federal copyright cases. Then he sought to proceed without pre-payment of costs, averring a pauper's status. Next, when the case was called before a Magistrate Judge, he withheld the "consent" to *any* adjudication by a judicial officer at this level, even though consent is required by the pertinent statute only for "final judgments and orders." On a motion for reconsideration, he insisted that the case be certified to the Civil Division for action before an Associate Judge.  That denied, he filed a Motion to Reconsider.  Meanwhile, even though his motion for reconsideration was still under consideration, he filed yet a new lawsuit against the same Defendants in the Civil Division and then moved to have this one consolidated with the new one.[3]

---

[3]  It is not so much the fact that the Plaintiff has pursued a "dual track" approach to his claim, once he was ejected from the Small Claims Branch, that rankles. Particularly in the face of what he apprehends as the imminent expiration of the pertinent statute of limitations, that course of action, after all, would be advisable in order to preserve any *legitimate* rights in danger of expiration.  What is egregious here is that he has filed a new action that *remains* in a Court that never had jurisdiction in *any* of its Divisions.  Thus, by refusing to file his putative claim in the only Court that *does* have jurisdiction (the U.S. District Court here), Whitehead has knowingly squandered any claim that he may have and, in the process (as usual) needlessly burdened not only both Defendants in this action, but also two judicial officers of this Court. *See, e.g.*, Bond v. Serano, 566 A.2d 47, 48-49 (D.C. 1989)(mis-filing a case in federal court did *not* toll the running of the local statute of limitations so that, once the

In so doing, he has effectively mooted dismissal here and obviated a ruling on the "consent/dismissal" issue. In short, engaging in yet another instance of litigatory mitosis, he has managed to turn one misplaced Small Claims case into two groundless lawsuits – all in a case (a) in a Court in which his action does not properly lie, (b) is doomed to dismissal, and (c) would only inevitably end up being removed to an Article III Court, which has already guaranteed him that he will be sanctioned severely for pursuing such misbegotten claims.

In view of this procedural record, the Court has decided that, technically speaking, the Plaintiff's Motion for Reconsideration will be granted, but with specific recommendations, based on the following:

## I. THE GRIST

In a saturnalia of litigation covering[4] courts in at least 11 jurisdictions over the last 12 years, this Plaintiff has filed legal actions involving no fewer than 68 defendants.[5] These filings have occasioned the previous issuance of 93 citations, orders, and opinions, including 30 from a total of four U.S. District Courts (including 25 from the local U.S. District Court), 50 from five U.S. Circuit Courts

---

dismissal was finalized there, the case could be filed here after the statute had already expired). The high probability, therefore is that, by his steadfast refusal to file in the proper court, Mr. Whitehead has mooted his case and altogether forfeited whatever claim he may have had.

[4] The following, it should be noted at outset of this fantastic tale, are just the *known* numbers; there may have been – and probably were – filings in other courts that have not been reported on the record.

[5] Whitehead has an impressive list of litigation targets. These include one President of the United States, a U.S. Attorney General, a former Attorney General, a Secretary of the Treasury, a Secretary of Labor, a Postmaster General, five CIA Directors, a Director of the FBI, a U.S. Solicitor General, a Commissioner of the IRS, a Chairman of the EEOC, a Congresswoman, a university, the D.C. Public School System, eight publishing houses, eight motion picture studios, two record companies, three television networks, the Washington *Post*, Microsoft, a major national bank, and one electronics store chain. Most lawyers have spent entire careers and never had such a litigation track record. If only he had had a paying client through all this.

-4-

of Appeals (including 36 from the local U.S. Court of Appeals), nine from the U.S. Supreme Court, and one from a State Supreme Court – and finally this one from a pedestrian Magistrate Judge, bringing the total "fruit" of this erstwhile barren tree to 94 final or dispositive orders -- none of which has accomplished a thing. Almost all of this litigation was tied to the Plaintiff's self-styled image as a writer.

## A. **The Seminal Work**

At the outset of the 1990's, Whitehead completed and published what amounts to his "professional memoirs," recounting his career with the Central Intelligence Agency (CIA), in the book *Brains, Sex & Racism in the CIA and the Escape* (Equality America Press,[6] 1991).[7] In the course of writing and publishing the book, he was required to submit the manuscript to the CIA for "clearance," a procedure that is typical with former employees of national intelligence agencies. In the heat of his ire and distrust for the Agency, however, Whitehead perceived an *ignis fatuus* that led to his belief that the CIA had infringed on his implicit federal copyright on the unpublished manuscript by "improperly disseminating [it] to members of Congress and the Hollywood movie industry" and, by so doing, "reducing the value of his copyrighted material." [8]

This belief set off what can only be termed an ensuing "firestorm" of copyright infringement litigation that Whitehead waged against the CIA and accompanying reels of claims against various motion picture studios and

---

[6]   A search of the Internet for this publisher finds no book other than Mr. Whitehead's CIA tome ever associated with it.

[7]   A quick check at <Amazon.com> reveals that three copies of Mr. Whitehead's book are currently available, including one autographed by the author, for what the bookseller bills as "Excellent UNREAD 1991 'AUTHOR AUTOGRAPHED' [copy] Pbk/Equality America Press! SMOOTH SPINE & COVER! BRITE TIGHT MINT Pgs! NO marks, tears, [or] edgewear!" (capitals in original) for what is surely a bargain price of $47.95.

[8]   *See* Whitehead v. Deutch, 1997 D.D.C. LEXIS 22793 at *4 & *6   (Mar. 31, 1997)(Friedman, J.).

publishers over the next decade and more.  During that litigation he ultimately arrived before Judge Paul L. Friedman of the U.S. District Court here.  In the course of litigating a total of fifteen cases that Whitehead had already filed in that Court, Judge Friedman found it necessary to read his CIA book.[9]  The Judge found it to be "an autobiographical account of his seven years with the Central Intelligent Agency," where Whitehead had worked mostly as a "relatively low-level desk employee," starting as a computer operator in 1983, and five years later, ironically, becoming a recruiter.  His tenure there ended suddenly and bitterly with his discharge in 1990.[10]

According to Judge Friedman's reading, Whitehead sees himself as "intelligent, aggressive and athletic" and, apparently, virtually irresistible to a wide variety of women.[11]  The book "gives detailed descriptions of the many women with whom Mr. Whitehead had sexual relations or relationships or who he thought were attracted to him.  From his descriptions, the women cover a broad spectrum; they are African-American, white and Asian-American, lawyers, doctors, students and secretaries.  All are described as beautiful." [12]  The book goes on to recount Whitehead's literally sudden departure from the CIA after he had been summoned before his superiors, who demanded the return of his credentials.  Whitehead reports that he thereupon bolted out of the building, pursued by security guards down a garage exit ramp and onto the street, "with an old white lady leading the pack" of security personnel in pursuit.[13]

Since then, Whitehead confesses in his book, he has become "slightly

---

[9] *See* Whitehead v. Paramount Pictures, Corp., 53 F.Supp.2d 38, 48 (D.D.C. 1999).

[10] *Id.* at 41 & 50.

[11] *Id.* at 41.

[12] *Id*

[13] *Id.* at 41 & 51.

paranoid." In further meanderings therein, he "appears to believe that someone may have drugged the drinking water in his refrigerator." [14] Apparently, on the well-known theory that, "Just because you're paranoid doesn't mean that they're not out to get you," he reports that later he visited his orthodontist, instructing her "'to take my braces off after wearing them for four years because I couldn't afford for the government to place communications devices in my braces.'" Had he not done so, he theorizes, "[w]ithout my doctor knowing it they could easily change her dental wires, and target my movements and sound with overhead satellites."[15]

It was this mind set, apparently, that generated the pyroclastic flow of litigation against the Central Intelligence Agency and, with it, almost every major motion picture company and publishing house in the land.

### B. The CIA Wars:  Mission Improbable

Virtually every lawsuit Whitehead has ever filed stems from his ill-fated employment with, and his ensuing Megiddo-like battle against, his former employer, the CIA.  It has included frontal assaults via a total of 23 legal actions against every CIA director since the elder Bush Administration, including one each against William H. Webster (1987-91)[16] and Robert M. Gates (1991-93),[17] seven

---

[14] *Id.* at 41.

[15] *Id.* at 49.

[16] *See* Whitehead v. Webster, 1991 D.D.C. LEXIS 13341 (May 14, 1991).

[17] *See* Whitehead v. Gates, 1993 U.S. App. D.C. LEXIS 38200 (July 27, 1993)(unpub. op.).

against R. James Woolsey (1993-95),[18] six against John M. Deutch (1995-96),[19] and eight against George J. Tenet (1997-2004).[20]

As noted above, Whitehead's public views of the CIA and its activities approach true LaRouchian dimensions.[21] For example, Whitehead is on record as believing that the late William J. Casey (1913-87), who was CIA Director during the Reagan Administration (1981-87), "faked his death" and that, instead he "was transferred out of the country or to a secret hideout in the United States." [22] He also implies in his paper that the CIA was behind the assassination of President

---

[18] *See* Whitehead v. Woolsey, 1993 N.D. Ill. LEXIS 15321 (Oct. 29, 1993); Whitehead v. Woolsey, 1994 E.D. Va. LEXIS 21380 (Feb. 10, 1994); Whitehead v. Woolsey, 1994 E.D. Va. LEXIS 21381 (Mar. 4, 1994); Whitehead v. Woolsey, 48 F.3d 1218 (4th Cir. 1995); Whitehead v. Woolsey, 51 F.3d 270 (4th Cir. 1995); and Whitehead v. Woolsey, 1995 4th Cir. LEXIS 6395 (Mar. 30, 1995)(unpub. op.).

[19] *See* Whitehead v. Deutch, 1997 D.D.C. LEXIS 22793 (Mar. 31, 1997); Whitehead v. Deutch, 67 F.3d 298 (4th Cir. 1995); Whitehead v. Deutch, 516 U.S. 803 (1995); Whitehead v. Deutch, 516 U.S. 1164 (1996); Whitehead v. Deutch, 516 U.S. 803 (1995); and Whitehead v. Deutch, 1995 4th Cir. LEXIS 27801 (Sept. 21, 1995).

[20] *See* Whitehead v. Tenet, 516 U.S. 803 (1995); Whitehead v. Tenet, 1997 U.S. App. D.C. LEXIS 26336 (Aug. 22, 1997)(unpub. op.); Whitehead v. Tenet, 522 U.S. 1129 (1998); Whitehead v. Tenet, 523 U.S. 1055 (1998); Whitehead v. Tenet, 2000 U.S. App. D.C. LEXIS 11691 (Apr. 5, 2000)(unpub. op.); Whitehead v. Tenet, 2000 D.D.C. LEXIS 14975 (Sept. 1. 2000); Whitehead v. Tenent, U.S. App. D.C. LEXIS 6634 (Mar. 16, 2001); and Whitehead v. Tenet, U.S. App. D.C. LEXIS 18440 (July 27, 2001)(unpub. op.). It was after Tenet had survived four years of litigation with Mr. Whitehead that President George W. Bush awarded him the Medal of Freedom on December 2, 2004.

[21] Some of Whitehead's theories are rivaled only by those ascribed to perennial presidential candidate Lyndon H. LaRouche, who is said to believe, among other things, that the British Monarchy was behind the Oklahoma City bombing and the funding the international illicit drug cartel.

[22] Whitehead v. Paramount Pictures Corp., 53 F.Supp.2d at 51. It is, however, a matter of public record that Casey had a stroke, major hospitalization, a death certificate, an autopsy, a funeral, and a burial in 1987. Part of this ruse, presumably, is a grave site in Holy Rood Cemetery in Westboro (Nassau County), New York, replete with a five-foot Celtic Cross atop a seven-foot-long sepulcher bearing Casey's name. *See* "Find-A-Grave" on the Internet at <http://findagrave.com/cgi-bin/fg.cgi?page=gr&GRid=2570&pt=William%20Casey>.

Kennedy and has predetermined the winners of every presidential election since then.[23] Whether it be due to the CIA''s suspected dark and clandestine control of the government at large, other sinister forces, or just bad karma, every one of Whitehead's CIA suits was dismissed before any action occurred on the putative "merits."

Tracking the Whitehead-CIA litigation is as complex a task as balancing valences in a Chemistry I class. According to the published record, the following table organizes this blizzard of litigation, accounting for legal actions spanning a decade in three U.S. District Courts and two U.S. Circuit Courts, mostly over Whitehead's claim that he was terminated due to racial discrimination in violation of Title VII of the Civil Rights Act of 1964:

---

[23]  *See* "Bill Clinton and the Negroes," *ante* at p. 10.

## Whitehead v. CIA Cases

| Trial Cases | Corresponding Appellate Cases |
|---|---|
| *Whitehead v. Webster*, 1991 D.D.C. LEXIS 13341 (May 4, 1991)(No. 91-272 ) | |
| *Whitehead v. Gates*, No. 92-917 (D.D.C.) * | *Whitehead v. Gates*, 1993 U.S. App. D.C. LEXIS 38200 (Jul. 27, 1993)(No. 93-5055) |
| *Whitehead v. Woolsey*, 1993 N.D. Ill. LEXIS 15321 (Oct. 29, 1993)(No. 92-C-685) | |
| *Whitehead v. Woolsey*, 1994 E.D. Va. LEXIS 21380 (Feb. 10, 1994)(No. 93-1291A<br>*Whitehead v. Woolsey*, 1994 E.D. Va. LEXIS 21381(Mar. 4, 1994)(No. 93-1291A ) | |
| *Whitehead v. Woolsey*, No. 93-1363A(E.D. Va.)** | *Whitehead v. Woolsey*, 48 F.3d 1218 (4th Cir. 1995) (No. 94-1256)<br>*Whitehead v. Woolsey*, 1995 4th Cir. LEXIS 4123 (Mar. 2, 1995) |
| *Whitehead v. Woolsey*, No. 93-1291A(E.D. Va.)*<br>*Whitehead v. Woolsey*, No. 93-1547 (E.D. Va.)*<br><br><br>*sub nom.*<br>*Whitehead v. Deutch*, No. 93-1291A (E.D. Va.) *<br>*Whitehead v. Deutch*, No. 93-1547A (E.D. Va.) * | *Whitehead v. Woolsey*, 51 F.3d 270 (4th Cir. 1995) (Nos.93-2578; 94-1241; 94-1371;94-1521)<br>*Whitehead v. Woolsey*, 1995 4th Cir. LEXIS 6395 (Mar. 30, 1995)(same)<br><br>*sub nom.*<br>*Whitehead v. Deutch*, 67 F.3d 298 (4th Cir. 1995) (Nos. 95-2089 & 95-2186)<br>*Whitehead v. Deutch*, 19954th Cir. LEXIS 27801)(Oct. 3, 1995)(same) |
| *Whitehead v. Deutch*, 1997 D.D.C. LEXIS 22793 (Mar. 31, 1997)(No. 96-420 **<br><br><br><br><br>*Whitehead v. Deutch*, 2000 D.D.C. LEXIS 14975 (Sept. 1, 2000)(No. 96-420) ** | *sub nom.*<br>*Whitehead v. Tenet*, 1997 U.S. App. D.C. LEXIS 26336 (Aug. 22, 1997)(No. 97-5151)<br>*Whitehead v. Tenet*, 2000 U.S. App. D.C. LEXIS 11691 (Apr. 5, 2000)(No. 99-5371)<br><br>*sub nom.*<br>*Whitehead v. Tenet*, 2001 U.S. App. D.C. LEXIS 7537 (Mar. 16, 2001)(No. 00-5360)<br>*Whitehead v. Tenet*, 2001 U.S. App. D.C. LEXIS 6634 (Mar. 16, 2001)(No. 00-5292)<br>*Whitehead v. Tenet*, 2001 U.S. App. D.C. LEXIS 18440 (Jul. 27, 2001)(No. 01-5108) |

\*  Cases without LEXIS or West Reporter citations have no published opinions or orders relied upon herein.

\*\*  Shaded areas indicate copyright infringement cases and appeals; all others are Title VII discrimination cases.

Almost immediately after his discharge in 1990,[24] Whitehead filed suit against the CIA in the U.S. District Court for the District of Columbia, alleging racial discrimination and "constructive termination."  In May of that year, however, noting that most of the allegedly discriminatory acts of which Whitehead complained occurred during his brief tour of duty in Chicago, the District Court here determined to certify the case to the Northern District of Illinois, over Whitehead's opposition.[25] After the Agency filed a motion there for a change of venue, in October 1993 the Illinois Federal Court, "in the interests of justice," re-transferred the case to the Eastern District of Virginia, wherein the CIA is headquartered and well within reach of the Federal District (D.C.), wherein Whitehead had initially filed his suit.[26] Two years later, the original D.C. *cum* Chicago Title VII suit wended its way to the Eastern District, perhaps the Number One "No-Nonsense" Federal Docket in the United States.[27]  There, Whitehead's dilatory tactics met with the short shrift for which that Court is famous.  Having fought the transfer and lost, Whitehead wrongheadedly decided that "passive resistance" would produce the kind of trouble and delay for which he would become notorious.  When, in his own suit, he twice failed to appear for a duly-noticed deposition, the CIA filed a motion for sanctions, which was referred to one of the Court's Magistrate Judges for a report and recommendation. The Magistrate

---

[24] The Agency's stated reasons for discharging Whitehead do not appear anywhere on the published record.

[25] <u>Whitehead v. Webster</u>, 1991 D.D.C. LEXIS 13341 at *2 ("Defendant [CIA] correctly points out that the District of Columbia is an improper venue for this cause of action. None of the alleged unlawful practices occurred in this district, plaintiff's employment records are not kept here, and plaintiff would not have worked here absent the unlawful action.").

[26] <u>Whitehead v. Woolsey</u>, 1993 N.D. Ill. LEXIS 15321 at *2-*3 (Case. No. 93-1291A).

[27] Where it was docketed as <u>Whitehead V. Woolsey</u>, No. 93-1291A.

Judge found that Whitehead "had willfully and without justification or excuse ... failed to report for his scheduled deposition; ... failed to fully answer [i]nterrogator[ies] ...; failed to provide copies of documents listed ...; and ... failed to identify the specific document request to which the numbered documents were in response," all "in blatant disregard of ... [the Associate Judge's] Order." The Magistrate Judge thereupon concluded that these dilatory and obstructionist tactics "warranted dismissal of the case with prejudice," and recommended to his superior.[28] Surprisingly, however, in an apparent paroxysm of patience, Chief Judge James C. Cacheris rejected the dismissal recommendation but required Whitehead thenceforth to strictly conform to discovery requirements.[29] Predictably, however, Whitehead failed (or refused) to heed this admonition and the case was, in fact, ultimately dismissed, a disposition that was summarily affirmed on appeal.[30]

No matter to Whitehead, though, because even **before** the Illinois Federal Court made any ruling on transferring his original Title VII case back to the Eastern District in October 1993, Whitehead had already filed a **second** Title VII suit against the Agency in the U.S. District Court here in the Summer that year in D.C.[31] But the second discrimination suit also went nowhere when Whitehead lost his bid to proceed *in forma pauperis*, not only at the trial level but also on appeal.[32]

---

[28]  Whitehead v. Woolsey, 1994 E.D. Va. 21380 at *3-*4.

[29]  Whitehead v. Woolsey, 1994 U.S. LEXIS 21381 at *1.

[30]  Whitehead v. Deutch, 67 F.3d 298 (4th Cir. 1995)(as to both Nos. 1291-A and 93-1547A out of the E.D. Va.) and Whitehead v. Deutch, 1995 4th Cir. LEXIS 27801 (same cases below)(Oct. 3, 1995)(dismissal affirmed without oral argument).

[31]  Styled Whitehead v. Gates, No. 92-917 (D.D.C.); it is unreported.

[32]  *See* Whitehead v. Gates, 1993 U.S. App. D.C. LEXIS 382000 at *1-*2 ("[T]he motion for leave to proceed on appeal *in forma pauperis* ... [is] denied. The district court

Meanwhile, apparently, in 1993, Whitehead had filed yet a ***third*** Title VII suit against the Agency in the Eastern District.[33] When certain Defendants were dismissed,[34] Whitehead appealed to the Fourth Circuit, seeking a mandamus to reinstate them. Not only did the U.S. Circuit Court deny the appeal for lack of jurisdiction as to a non-final order, it also found on its face that from "[o]ur review of the record and the district court's orders ..., this appeal is without merit" because "[t]he district court correctly found that, even if Whitehead had established a *prima facie* case of discrimination, he was unable to rebut the legitimate nondiscriminatory reasons given by the Defendants for his termination."[35] With this ruling, every one of Whitehead's Title VII cases – and their ensuing appeals – had been found to be utterly "without merit."[36]

As noted above, however, during this same period, Whitehead, not satisfied with suing CIA Directors, had shifted his windage and elevation to "bigger game." Like Col. Custer himself, Whitehead moved up from the lower grasslands of litigation and strode defiantly to the top of "Last Stand Hill," filing two actions against the Commissioner of Internal Revenue,[37] three involving Attorney General

---

correctly ruled that there is no basis for this appeal.").

[33]   Whitehead v. Deutch, No. 93-1547. In this one he added as additional Defendants the Director of the FBI, the Secretary of Labor, the Director of the U.S. EEOC, the Chairperson of the EEOC Commission, the U.S. Postmaster General, a record company, a major bank, an electronics retail store, and 14 individual defendants.

[34]   *See* Whitehead v. Woolsey, 51 F.3d 270 (4th Cir. 1995).

[35]   Whitehead v. Woolsey, 1995 4th Cir. LEXIS 6395 at *2-*3.

[36]   *Id.* at *3.

[37]   *See* Whitehead v. Commissioner, 1994 U.S. App. D.C. LEXIS 37232 (Dec. 14, 1994)(unpub. disp.).

Janet Reno,[38] two against President Clinton,[39] and two against the United States Government itself.[40]  And, like Custer, he lost them all.  The suit against the President, for example, was dismissed at the trial level "as frivolous" and Whitehead's requests on appeal were denied *sua sponte* by the Circuit Court as being "so clear[ly meritless] as to warrant summary action." [41]  *Un*like Custer, though, Whitehead lived to fight another day.

### C.  At the Movies

Based on Whitehead's assertions that major movie companies had stolen themes, plots, ideas, characters, and dialog from his book, he has filed lawsuits against at least 11 of them,[42] including three each against MGM,[43] New Line

---

[38] *See* Whitehead v. Reno, 1996 U.S. App. D.C. LEXIS 24132 (Aug. 16, 1996)(unpub. op.); Whitehead v. Reno, 1996 U.S. App. D.C. LEXIS 34411 (Dec. 27, 1996)(unpub. op.); and Whitehead v. Reno, U.S. App. D.C. LEXIS 34424 (Dec. 27, 1996).

[39] *See* Whitehead v. Clinton, U.S. App. D.C. LEXIS 6926 (Mar. 23, 2000)(unpub. op.); Whitehead v. Clinton, 531 U.S. 976 (2000); and Whitehead v. Clinton, 121 S.Ct. 754 (2001)(cert. den.).

[40] *See* Whitehead v. United States, 1997 U.S. Claims LEXIS 322 (Dec. 23, 1997) and Whitehead v. United States, 155 F.3d 574 (Fed. Cir. 1998).

[41] Whitehead v. Clinton, 2000 U.S. LEXIS 6926 at *2-*3.

[42] This Court's research has found Whitehead's suits against the Walt Disney Co., Columbia Pictures, Dreamworks Pictures, Home Box Office, MGM, New Line Cinema, Paramount Pictures, Sony Pictures International, Touchstone Pictures, Viacom, and Warner Bros.

[43] *See* Whitehead v. MGM Studio, Inc., 2000 D.D.C. LEXIS 20773 (June 14, 2000); Whitehead v. MGM Studio, Inc., 2000 U.S. App. D.C. 7245 (Mar. 7, 2000); Whitehead v. MGM Studio, 2001 U.S. App. D.C. LEXIS 2738 (Jan. 19, 2001)(unpub. op.); and Whitehead v. MGM Studio, 2001 U.S. App. D.C. LEXIS 2738 (Jan. 19, 2001).

Cinema,[44] and Viacom,[45] five each against Columbia Pictures[46] and Warner Bros.,[47] six against Dreamworks Pictures,[48] and eight against Paramount Pictures.[49]

Whitehead insists that over an eight-year span (1994-2002), Hollywood

---

[44] *See* Whitehead v. New Line Cinema, 1999 D.D.C. LEXIS 22476 (Sept. 3, 1999); Whitehead v. New Line Cinema, 2000 D.D.C. LEXIS 19794 (June 14, 2000); and Whitehead v. New Line Cinema, 2001 U.S. App. D.C. LEXIS 2714 (Jan. 19, 2001)(unpub. op.).

[45] *See* Whitehead v. Viacom, 233 F.Supp.2d 715 (D.Md. 2003); Whitehead v. Viacom, Inc., 2003 4th Cir. LEXIS 9821 (May 21, 2003)(unpub. op.); and Whitehead v. CBS/Viacom, Inc., 315 F. Supp.2d 1, (D.D.C. 2004) and 221 F.R.D. 1 (D.D.C. 2004). He also filed at least one other suit against the technically separate, but related, entity, CBS/Viacom. *See* Whitehead v. CBS/Viacom, Inc., 315 F. Sup.2d 1 (D.D.C. 2004) and 221 F.R.D. 1 (D.D.C. 2004).

[46] *See* Whitehead v. Columbia Pictures, Inc., 2000 U.S. App. D.C. LEXIS 11700 (Apr. 25, 2000)(unpub. op.); Whitehead v. Columbia Pictures Indus., 2000 D.D.C. LEXIS 22188 (June 14, 2000); Whitehead v. Columbia Pictures, Inc., 2001 U.S. App. D.C. LEXIS 2713 (Jan. 19, 2001)(unpub. op.); Whitehead v. Columbia Picture Corp., 2001 U.S. App. D.C. LEXIS 2748 (Jan. 19, 2001); and Whitehead v. Columbia Pictures Indus., 2001 U.S. App. D.C. LEXIS 18381 (July 27, 2001)(unpub. op.).

[47] *See* Whitehead v. Warner Bros., 2001 U.S. App. D.C. LEXIS 2739 (Jan. 19, 2001)(unpub. op.); Whitehead v. Warner Bros., Inc., 2000 U.S. App. D.C. LEXIS 11645 (Apr. 5, 2000); Whitehead v. Warner Bros., Inc., 2000 D.D.C. LEXIS 20775 (June 14, 2000); and Whitehead v. Warner Bros., Inc., 1999 D.D.C. LEXIS 22670 (Sept. 3, 1999).

[48] *See* Whitehead v. Dreamworks, LLC, 1999 D.D.C. LEXIS 22671 (Sept. 3, 1999); Whitehead v. Dreamworks, LLC, 1999 D.D.C. LEXIS 22669 (Oct. 21, 1999); Whitehead v. Dreamworks Pictures, Inc., 1998 4th Cir. LEXIS 22319 (Sept. 11, 1998)(unpub. op.); Whitehead v. Dreamworks Pictures, Inc., 163 F.3d 600 (4th Cir. 1998)(unpub. op.).; Whitehead v. Dreamworks, LLC, 2000 D.D.C. LEXIS 20774 (June 14, 2000); and Whitehead v. Dreamworks Pictures., 2001 U.S. App. D.C. LEXIS 2741 (Jan. 19, 2001)(unpub. op.).

[49] *See* Whitehead v. Paramount Pictures Corp., 145 F.Supp.2d 3 (D.D.C. 2001); 53 F.Supp.2d 38 (D.D.C. 1999); Whitehead v. Paramount Pictures Corp., 1997 U.S. App. D.C. LEXIS 5997 (Feb. 27, 1997)(unpub. op.); Whitehead v. Paramount Pictures Corp., 2000 U.S. App. D.C. LEXIS 11716 (Apr. 19, 2000)(unpub. op.); Whitehead v. Paramount Pictures Corp., 2001 U.S. App. D.C. LEXIS 2748 (Jan. 19, 2001)(unpub. op.); and Whitehead v. Paramount Pictures Corp., 2001 U.S. App. D.C. LEXIS 18380 (July 27, 2001)(unpub. op.).

pirated his ideas on over two dozen major motion pictures (among them two animated features), including *Forrest Gump* (1994);[50] *The Net* (1995);[51] *Tyson* (1995);[52] *Mission Impossible* (1996);[53] *Jerry Maguire* (1996);[54] *Eraser* (1996);[55] *Amistad* (1997);[56] *Titanic* (1997);[57] *Most Wanted* (1997);[58] *Wag the Dog* (1997);[59] *Red Corner*

---

[50] Starring Tom Hanks and Robin Wright Penn (Forrest Gump, while not intelligent, has accidentally been present at many historic moments, but his true love, Jenny, eludes him.). **Note:** All plot capsules in the following notes are taken from <http://us.imdb.com/> ("IMDb: Earth's Biggest Movie Database").

[51] Starring Sandra Bullock, Jeremy Northam and Dennis Miller (Bullock is a software engineer who works from home and has few friends outside of cyberspace. Taking her first vacation in years she becomes embroiled in a "web" of computer espionage.).

[52] TV movie starring George C. Scott, Paul Winfield and Michael Jai White (The story of Mike Tyson from his early days as a 12 year old amateur to the undisputed title of "Heavyweight Champion of the World", and ultimately to his conviction for rape.).

[53] Starring Tom Cruise, John Voight and Vanessa Redgrave (An American agent, under false suspicion of disloyalty, must discover and expose the real spy without the help of his organization.).

[54] Starring Tom Cruise, Cuba Gooding, Jr. and Renée Zellweger (When a sports agent has a moral epiphany and is fired for expressing it, he decides to put his new philosophy to the test as an independent with the only athlete who stays with him.).

[55] Starring Arnold Schwarzenegger, James Caan and Vanessa Williams (A witness protection specialist becomes suspicious of his co-workers when dealing with a case involving high-tech weapons.).

[56] Starring Morgan Freeman, Nigel Hawthorne and Anthony Hopkins (Fact-based story of the 1839 revolt by Africans on the slaveship *Amistad* and their subsequent trial when they are taken to American soil.).

[57] Starring Leonardo DiCaprio and Kate Winslet (Fictional romantic tale of a rich girl and poor boy who meet on the ill-fated voyage of the legendary "unsinkable" ship.).

[58] Starring Keenan Ivory Wayans, Paul Sorvino and Jill Hennessy (A Marine on death row is recruited by a shadowy U.S. military officer as part of a top-secret ops team, then gets framed for murder when the team and its officer set him up as the fall guy for the assassination of the First Lady.).

[59] Starring Dustin Hoffman, Robert DeNiro and Anne Heche (Before elections, a spin-doctor and a Hollywood producer join efforts to "fabricate" a war in order to cover

(1997);[60] *Only in America* (1997);[61] *Austin Powers I, II & III* (1997, 1999 & 2002);[62] *Hercules* (1997);[63] *Enemy of the State* (1998);[64] *U.S. Marshals* (1998);[65] *A Prefect Murder* (1998);[66] *Prince of Egypt* (1998);[67] *Why Do Fools Fall in Love* (1998);[68] *How*

---

up a presidential sex scandal.).

[60] Starring Richard Gere and Ling Bai (Gere is an American attorney having talks in Bejing about founding the first satellite TV joint venture. Suddenly he is arrested, accused of murder and has to prove it was a frame-up, together with his court-appointed attorney played by Bai.).

[61] Starring Jill Bowden and Sara Scott Davis (A satire, which tells three interrelated stories about bureaucratic conspiracies, televangelism, the war on drugs, and the information society, all taking place in Dallas.)

[62] Starring Mike Myers, Elizabeth Hurley, Michael York, Heather Graham and Beyoncé Knowles (A 1960's hipster secret agent is brought out of cryofreeze to oppose his greatest enemy into the 1990's, where his social attitudes are glaringly out of place, *ad nauseam*.).

[63] Animated adventure featuring the voices of Tate Donovan, Danny DeVito, James Woods, Rip Torn, Samantha Eggar, Barbara Barrie, Hal Holbrook,  and Paul Shaffer, among others.  (The son of the Greek Gods Zeus and Hera is stripped of his immortality as an infant and must become a true hero in order to reclaim it.).

[64] Starring Will Smith, Gene Hackman and Lisa Bonet (A lawyer becomes a target by a corrupt politician and his NSA goons when he accidently receives key evidence to a serious politically-motivated crime.).

[65] Starring Tommy Lee Jones, Wesley Snipes and LaTanya Richardson (U.S. Marshal Samuel Gerard (Jones) and his team of Marshals are assigned to track down Sheridan (Snipes), a murderer and robber.).

[66] Starring Michael Douglas, Gwyneth Paltrow, Viggo Mortensen (A powerful husband, an unfaithful wife, and a jealous lover. All of them have a motive and each of them has a plan in this remake of Alfred Hitchcock's 1954 "Dial M for Murder.").

[67] Animation with the voices of Val Kilmer, Ralph Fiennes, Michelle Pfeiffer, Sandra Bullock, Jeff Goldblum, Danny Glover, Patrick Stewart, Steve Martin and Martin Short)(The Moses Story:  An Egyptian prince learns of his identity as a Hebrew and his destiny to become the chosen deliverer of his people.).

[68] Starring Halle Berry, Vivica A. Fox, Lela Rochon and Lerenz Tate (Three different women married Frankie Lymon (Tate).  Now as they fight to get a piece of his millions, they will have to prove who married him first and who loved him most.).

*Stella Got Her Groove Back* (1998);[69] *Eyes Wide Shut* (1998);[70] *Hannibal* (2001);[71]

*Mission Impossible II* (2002);[72] and the ironically-titled *Bad Company* (2002).[73] An

impressive portfolio, to be sure.[74]

---

[69] Starring Angela Bassett, Whoopi Goldberg and Taye Diggs (Bassett plays a highly successful, 40-something San Francisco stock broker who is persuaded by her colorful New York girlfriend Delilah (Goldberg) to take a well-deserved, first-class vacation to Jamaica, where she encounters a strapping young islander, Winston Shakespeare (Diggs). His pursuit of her turns into a hot and steamy romance that forces Stella to take personal inventory of her life and try to get a balance between her desire for love and companionship, and the responsibilities of mother and corporate executive.).

[70] Starring Tom Cruise and Nicole Kidman (Cruise plays a doctor who is married to an art curator. One day his wife admits that she almost cheated on him and that leads Cruise through an odyssey of sexual and moral discovery.).

[71] Starring Anthony Hopkins, Julianne Moore and Giancarlo Giannini (Hannibal Lector returns to America and attempts to make contact with Agent Starling (Moore) and to survive a vengeful victim's plan.).

[72] Starring Tom Cruise, Sean Ambrose and Nyah Nordoff-Hall (A secret agent is sent to find and destroy a genetically modified disease called "Chimera.").

[73] Starring Anthony Hopkins and Chris Rock (When a Harvard-educated CIA agent is killed during an operation the Agency recruits his twin broker (Rock).).

[74] Apparently, throughout the last half of the final decade of the 20th Century, Mr. Whitehead spent most of his time at the movies. Though a single mind so fertile as to have spawned this concatenation of complex works would be da Vincian in depth, breadth, and scope, one wonders how Whitehead would have had time to write or compose anything – much less to litigate as much as he did. Two of these movies, *Forrest Gump* (1994) and *Titanic* (1997) won the Oscar for "Best Picture," after all. For all his vaunted and self-proclaimed "genius" as a writer (the term he used to characterize his work in his copyright application in this case), his written submissions to various courts have uniformly drawn poor reviews therefrom. *See, e.g.,* Whitehead v. Paramount Pictures, 53 F.Supp.2d at 50 (describing his book as merely "a detailed meandering narration of his day-to-day activities of his life" and his pleadings as "irrelevant ... analysis"); Whitehead v. Columbia Pictures, 2000 D.D.C. LEXIS 22188 at *6 (finding that he had "flooded the Court with barely coherent pleadings and motions that collectively signify little more than his adroitness with the cut-and-paste function of his word processor"); Whitehead v. Warner Bros., 2000 D.D.C. LEXIS 20775 at *4 (characterizing his submissions as "frivolous, dilatory motions" that proved "ultimately irrelevant"); Whitehead v. Dreamworks LLC, 2000 D.D.C. LEXIS 20744 at *2 ("dozens of frivolous, dilatory motions" that proved "ultimately irrelevant"); Whitehead v. MGM Studio, Inc., 2000 D.D.C. LEXIS 20773 at *2 (same language); Whitehead v. Time Warner, Inc., 2000 D.D.C. 20765 at *2 )(same language); Whitehead v. New Line Cinema, 2000 D.D.C. LEXIS

Doubtless, it is a continuing indictment of the well-known shallowness, superficiality, and lassitude of Hollywood moguls that, as Whitehead would have it, though his fecund works had been the "public domain" since at least 1991, with the publication of his effluvial *Brains, Sex and Racism*,[75] it apparently took them until the middle of that decade to "pick up" on the cornucopia of gems contained therein. Once having done so, he postulates, they rushed at least a dozen major motion pictures into quick and successive production and release within five years (1994-99) – one on average of every three months -- in order to make as much money as possible from his ideas and then quickly retire from the scene before he could get past the many litigation hurdles that they have placed in his path toward deserved recovery.

Unfortunately for Whitehead, though, he has never been able to persuade even a single judge in ***any*** court to allow ***any*** of his claims even to ***go*** to trial; ***all*** were dismissed – and in the most peremptory manner. Judge Friedman, the jurist most familiar with all these cases, found that throughout all his claims, "Mr. Whitehead attempts to draw similarities between the most minuscule elements"

---

19794 at *2 (same language); Whitehead v. Paramount Pictures Corp., 145 F.Supp.2d at *5 (describing his written submissions as "opaque, nonsensical and frivolous"); Whitehead v. Viacom, 2333 F.Supp.2d at 717-19 & 726 (describing his submissions at various points therein as "opaque, nonsensical and frivolous," "egregious," "conclusory," "non-substantive and nonsensical," and "completely irrelevant"); Whitehead v. CBS/Viacom, Inc., 221 F.R.D. 1, 4 (D.D.C. 2004)(describing his opposition as "conclusory and unsupported"); and Whitehead v. CBS/Viacom, Inc., 315 F.Supp.2d 1, 10 (D.D.C. 2004)(finding his submissions to be only "unsupported, conclusory statements").

[75] Somehow, Mr. Whitehead overlooks the movie *Sex, Lies & Videotape* (1989)(James Spader and Andie MacDowell)(A sexually repressed woman's husband is having an affair with her sister. The arrival of a visitor with a rather unusual fetish changes everything.). Whitehead's book, published two years ***after*** the release of this movie, could, by his own liberal standards, be an infringement on screenwriter Steven Sonderbergh's copyright. It has the word "sex" in, and even the same cadence in the title, after all.

of his work and those which he targets.[76] Whitehead does not seem to understand – or feigns that he does not understand -- the difference between a copyrightable ideas, plot, language, or dialog, on the one hand, and a general theme, an appealing concept, or a *scène à faire*, on the other.[77]

Predictably, Whitehead has failed utterly in his attempts to connect the CIA as the "leak" of the artesian wellspring of ideas that he insists flowed from his book into the undeserving coffers of Hollywood. In 1994, early on during his Title VII litigation with the Agency in the Eastern District, recounted above, he filed another suit there against the CIA, demanding that it share liability for resultant putative copyright violations.[78] That case was not only dismissed by the trial court and a motion for reconsideration denied,[79] but the inevitably resultant appeal to the Fourth Circuit also resulted in a summary affirmance without oral argument.[80]

Within a year, however, Whitehead was ***back*** in the U.S. District Court in ***D.C.***, resurrecting ***both*** the Title VII and copyright infringement cases in yet another CIA suit.[81] Judge Paul Friedman dismissed the case on *res judicata* grounds, finding that it was the same claim involving the same parties and the same issues that had been litigated and dismissed in the Eastern District of

---

[76] Whitehead v. Paramount Pictures Corp., 53 F.Supp.2d at 51.

[77] A *scène à faire* (Fr.) is a well-known phrase in the theater world, meaning "obligatory scene," one toward which the play has been moving and which the audience must be shown – for example, his realization that he is the killer of his father in *Oedipus*.

[78] Whitehead v. Woolsey, No. 93-1363A. This one also included Attorney General Janet Reno, FBI Director Louis Freeh, and Delegate Eleanor Holmes Norton as Defendants.

[79] *See* Whitehead v. Woolsey, 48 F.3d 1218 (4th Cir. 1995).

[80] Whitehead v. Woolsey, 1995 4th Cir. LEXIS 4123 (1995)(Mar. 2, 1995).

[81] Whitehead v. Deutch, 1997 D.D.C. LEXIS 22793 (No. 96-420)(Mar. 31, 1997).

Virginia and in the Fourth Circuit the year before.[82]  Shamelessly, having insisted on the U.S. District Court *here* previously, Whitehead then filed an audacious motion seeking transfer of the case to *another* (presumably *any* other) U.S. District Court, a motion which the local Federal Trial Court found, "like so many others that he has filed with this Court, is entirely frivolous and will be denied."[83] Moreover, after several more intervening "frivolous" motions for reconsideration had been denied over the following year, it was in this matter that the District Court also ruled that "[i]n addition to denying plaintiff's motion for reconsideration, the Court also ordered that plaintiff was no longer permitted to file documents in this case, other than appeals, because it was closed." [84] Whitehead did, indeed, then appeal to the U.S. Circuit Court here, but the District Court's rulings were summarily affirmed,[85] the Appellate Court ultimately holding that "Appellant's allegations ... are without merit." [86]  Thus, over a period of eight years of pointless litigation in two federal trial and appellate courts each, all of Whitehead's "CIA-based" copyright infringement cases were summarily dismissed and those dismissals likewise summarily affirmed, with no finding by *any* judge anywhere that *any* of them had even remotely made out a colorable claim.[87]

---

[82]  Whitehead v. Deutch, 1997 D.D.C. LEXIS 22793 at *5-*6 (Mar. 31, 1997), *aff'md sub. nom.* Whitehead v. Tenet, 1997 U.S. App. D.C. LEXIS 26336 (Aug. 22, 1997) and Whitehead v. Tenet, 2000 U.S. App. D.C. LEXIS 11691 (Apr. 5, 2000).

[83]  Whitehead v. Tenet, 2000 D.D.C. LEXIS 14975 at *1 (Sept. 1, 2000).

[84]  *Id.* at 1 n.1 & *3.

[85]  Whitehead v. Tenet, 2001 U.S. App. D.C. LEXIS 7537 (Mar. 16, 2001); *see also* Whitehead v. Tenet, 2001 U.S. App. D.C. LEXIS 6634 (Mar. 16 2001)(also dismissing for Whitehead's failure to pay filing fee).

[86]  Whitehead v. Tenet, 2001 LEXIS 18440 at *2 (Jul. 27, 2001)(This on yet another contention by Whitehead that the trial judge be disqualified from the case.).

[87]  And, indeed, as Judge Friedman pointed out, all of the foregoing was largely an illusory process because – as no other Judge had mentioned – if ever Whitehead had any

Meanwhile, Whitehead's similar suits against motion picture companies individually continued to meet with the same fate. In the *Mission Impossible* (1996) claim, Whitehead, a 40-something black male, somehow found a cause of action in the casting of Tom Cruise as a former CIA operative set on getting even with "The Company," largely on the grounds that "both have short black hair, both are in their early thirties, both are considered ... intelligent, patriotic and athletic .... [and] [w]omen are attracted to both," among other factors.[88]  But "[t]he Court found plaintiff's case to be patently frivolous and his claims objectively unreasonable."[89]  In the *Wag the Dog* (1997) case, as in the instant case, Whitehead's theory was *also* that the producers had somehow ferreted out a paper that he had written and had stolen the idea for the movie from it.  Finding also that his claims "were patently frivolous and objectively unreasonable," the D.C. federal court dismissed the case outright.[90]  Where the *Stella* claim is concerned, the Court found that "[o]nce again, plaintiff's claims are entirely without merit."[91]  In a truly astonishing claim regarding the animated feature

---

colorable claim against the CIA or any other Federal Government agency or department, under the pertinent statute his "exclusive remedy" had always lain *only* before the U.S. Court of Claims, pursuant to 28 U.S.C. § 1498(b)("Whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States ..., the exclusive remedy of the owner of such copyright shall be by action against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement."). Whitehead v. Tenet, 1997 D.D.C. LEXIS 22793 at *7.

[88] Whitehead v. Paramount Pictures Corp., 53 F.Supp.2d at 50.

[89] Whitehead v. Columbia Pictures, 2000 D.D.C. LEXIS 22188 at *16.

[90] Whitehead v. Paramount Pictures Corp., 53 F.Supp.2d at 48 ("No reasonable observer could find [plaintiff's college paper and the allegedly infringing film] substantially similar beyond the level of extremely abstract and non-protectible ideas.")(emphasis in original); *see also* Whitehead v. New Line Cinema, 2000 D.D.C. LEXIS 19794 (June 14, 2000)(Friedman, J.)(quoting same language and awarding attorney's fees and costs).

[91] Whitehead v. Columbia Pictures, 2000 D.D.C. LEXIS 22188 at *32.

*Prince of Egypt* (1998), Whitehead admitted that he had filed suit before the movie was even released and before he ever saw it. The Court found that, for Whitehead, this tactic was "not surprising" and deemed this suit to be "perhaps the most ludicrous among the many [claims] made" by him.[92] As a final example, in his *Bad Company* (2002) suit, the Court found Whitehead's contention of infringement based on the protagonist's wearing a tuxedo, working on a computer, being tired at the end of the day, and travel to Canada, to "approach the ridiculous."[93]  The end – for now.

### D.  The Malady Lingers On

In addition to his many other talents, Mr. Whitehead also claims to be a songwriter. In this incarnation he has also brought copyright infringement suits regarding two numbers. His claim as to the love song "How Do I Live?" (1997) was predicated on the fact that the song contains the words "without you."[94] But, as the federal court in that case found, "[i]t is difficult to think of a more generic theme in song than love, and the phrase 'without you' is far from being unique to plaintiff's work."[95]  He also claims to have written a Disney hit entitled "Through

---

[92]  <u>Whitehead v. Columbia Pictures</u>, 2000 D.D.C. LEXIS 22188 at *36.

[93]  <u>Whitehead v. Paramount Pictures Corp.</u>, 53 F.Supp.2d at 41 n.9

[94]  This was the theme song for the movie *Con Air* (1997)(starring Nicholas Cage, John Cusack and Monica Potter) -- released in the midst of the manifold putative thefts from Mr. Whitehead's works -- sung by Trisha Yearwood.  Sample lyric:

> How do I
> Get through one night without you?
> If I had to live without you,
> What kind of life would that be?

Apparently, the song is a paean to litigation.

[95]  <u>Whitehead v. Columbia Pictures</u>, 2000 D.D.C. LEXIS 22188 at *16. This Court's own particular favorite is "I'm So Miserable Without You, It's Almost Like Having You Here," by Stephen Bishop.

Heaven's Eyes."(1998)[96] This Court is of the opinion that the "viewpoint" is from the other direction. Judge Deborah K. Chasenow of the U.S. District Court in Maryland dismissed Whitehead's case on *res judicata* grounds, leaving that claim on a sour note also.[97]

### D. **Bad *Press* Company**

In addition, Whitehead has filed unsuccessful copyright infringement suits against publishers and newspapers, including one against Microsoft,[98] two against the Washington *Post*,[99] and three each against Time Warner[100] and Carroll & Graf Publishers.[101] Typical of these suits are the *Carroll & Graf* matters which were adjudicated in U.S. District Court here in 1999.[102] On September 3rd of that year,

---

[96] This was from the soundtrack of the animated feature *Prince of Egypt* (1998), on which Whitehead also filed a copyright infringement suit (*see* n.92, *ante*). Sample lyric:

> So how do you measure the worth of a man
> In wealth or strength or size
> In how much he gained or how much he gave
> The answer will come to ya
> To look at his life through heaven's eyes.

Good advice – if only followed. *See* Whitehead v. Viacom, 233 F.Supp.2 at 722 n.9.

[97] *Id.*

[98] *See* United States v. Microsoft Corp., 231 F.Supp.2d 144 (D.D.C. 2002).

[99] *See* Whitehead v. Washington Post, 1996 U.S. App. D.C. LEXIS (Apr. 18, 1996) and Whitehead v. Washington Post, 519 U.S. 877 (1996).

[100] *See* Whitehead v. Time Warner, 2001 U.S. App. D.C. LEXIS 2715 (Jan. 19, 2001)(unpub. op.).; Whitehead v. Time Warner, Inc., 2000 D.D.C. LEXIS 20765 (June 14, 2000); Whitehead v. Time Warner, Inc., 1999 D.D.C. LEXIS 22668 (Sept. 3, 1999).

[101] *See* Whitehead v. Carroll & Graf Publishers, Inc., 1999 D.D.C. LEXIS 22475 (Sept. 3, 1999); Whitehead v. Carroll & Graf Publishers, Inc., 1999 D.D.C. LEXIS 22474 (Dec. 8, 1999); and Whitehead v. Carroll& Graf, 2000 U.S. App. D.C. LEXIS 17992 (June 19, 2000).

[102] He had originally filed this suit in the U.S. District Court in Maryland, but it was transferred to the U.S. District Court here in January 1999, where Whitehead let it

-24-

in an early and unawares act of judicial indulgence, Judge Friedman found the claims as filed to be lacking but allowed Whitehead to amend his complaint, expressly admonishing him "that if the redrafted complaint raised copyright claims as patently frivolous as the claims were in plaintiff's recently dismissed case[s] ..., the Court will not hesitate to award defendants attorneys' fees and costs pursuant to the Copyright Act ...." [103] By December, however, Judge Friedman had granted the Defendant's motion to dismiss, based on Whitehead's own admission that he had made repeated misrepresentations expressly "under penalty of perjury" as to his putative service of other motions and papers on the Defendants. The Court found "every one of these motions" to contain material misrepresentations. Further finding Whitehead's "delinquent behavior" inexcusable, compounded by further "frivolous and contradictory motions," Judge Friedman summed up Whitehead's *modus operandi* thus:

> Such litigation tactics are not only prejudicial to the defendants, they constitute evidence of a disrespect for this Court and the justice system, as well as the possible commission of the crime of perjury. Plaintiff's conduct in this case cannot be tolerated and must be sanctioned. Because plaintiff has provided no proof of service and has made false representations to the Court concerning contacts with defendants' counsel and the issue of service, defendant's motion will be granted and this case will be dismissed ***with*** prejudice.[104]

A precedent had been set against Whitehead as he was thrown out of the

---

lay fallow for two years before even attempting to effect service. Whitehead v. Carroll & Graf Publishers, Inc., 1999 D.D.C. LEXIS 2274 at *.1.

[103] Whitehead v. Carroll & Graf Publishers, Inc., 1999 D.D.C. LEXIS 22475 at *5-*6. Judge Friedman continued to indulge Whitehead, who continued to abuse this lenity for at least another year. *See, e.g.*, Whitehead v. Columbia Pictures, 2000 D.D.C. LEXIS 22188 at * 40 ("The Court will not exercise its discretion to award attorney's fees ... [at this time, but] if the other cases currently pending before this court are as completely lacking in merit as are the claims in this action, the Court very well may award attorneys' fees and costs to the defendants in those actions.").

[104] *Id.* at *4 (emphasis in original).

U.S. District Court here, but he simply "moved on" to another arena. The very next year (2000), Whitehead was at it again, this time in the Southern District of New York, where he filed a "shotgun" lawsuit against an entire ride of defendants, including Paramount Pictures, Viacom, Inc., Disney Corp., Touchstone Pictures, Warner Bros., Columbia, Pictures, Sony Pictures Entertainment, Inc., and the USA Television Network (thus adding at least three new "notches" to his litigation gun – Disney, Touchstone and Sony), together with Time Warner Books, Simon & Schuster, Pocket Books, Signet Books (four new publishers) and, for good measure, "Unnamed White House Officials." The ultimate disposition of this blunderbuss case is unrecorded, even on the web site for the S.D.N.Y. Presumably, therefore, it went the way of all the others.[105]

### E. Paying in Peoria

A significant and tragic, if not vengeful, example of "collateral damage" stemming from the Whitehead's apparent vendetta against the CIA, and a course of action that shows his utter disregard for the rights of others when he imagines that he has been wronged, even indirectly, is his "siege litigation" against Bradley University, a prospering institution of higher learning located in Peoria, Illinois.[106]

Apparently, during his brief stint as a CIA recruiter in Chicago, Whitehead had visited the campus sometime in the early 1990's, attempting to recruit

---

[105] See Whitehead v. Paramount Pictures, et al., US SD NY 00 CIV 4740, reported at "Entertainment Law Digest" <http://entlawdigest.com/story.cfm?storr ID=595>.

[106] Founded in 1897, by philanthropist Lydia Moss Bradley (who was posthumously inducted into the National Women's Hall of Fame), it was one of the few co-educational institutions in the country established by a female. Currently it has an undergraduate enrollment of about 5,000 and a graduate school enrollment of about 750, offering bachelor's, master's and doctoral degrees in over 30 academic areas. Its distinguished alumni include a former Chairman of the Joint Chiefs of Staff, three Congressmen, including a former Republican Minority Leader of the U.S. House of Representatives, and a U.S. District Court Judge, not to mention numerous other leaders in the sciences, medicine, engineering, business, journalism, arts, and entertainment. (Taken from the school's web site at <http://www.bradley.edu/about/facts.shtmlhttp://www.bradley.edu/about/facts.shtml>.).

minority students. After several of them complained to a faculty member of Whitehead's "recruiting tactics," the professor conveyed these sentiments to the CIA, thus bringing down Whitehead's brimstone on the heads of students and faculty alike. Seizing the offensive, and knowing full well the inconvenience and expense that would be involved in such a venue, Whitehead filed a defamation suit in the U.S. District Court in the District of Columbia (where he lived at the time) against the university, the faculty, and several students, claiming damages of $5 million. Thereafter, for a minium of nine years (1991-98) (more than two entire "college generations"), Whitehead dragged them all through litigation at four state and federal court levels.[107]

When the U.S. District Court here *sua sponte* transferred the case to its sister court in the Central District of Illinois,[108] Whitehead fought the transfer at every turn, claiming, among other things, "that Peoria ... is racially hostile toward minorities." [109] In the Illinois Federal Court, Whitehead pursued two major claims against these Defendants, both of which were dismissed; likewise, his appeal was unsuccessful when the dismissals were summarily affirmed in 1993.[110]

---

[107] *See* Whitehead v. Bradley Univ., 1991 D.D.C. LEXIS 1224 (Jan. 29, 1991); Whitehead v. Bradley Univ., 12 F.3d 1101 (7th Cir. 1993); Whitehead v. Bradley Univ., 1993 7th Cir. LEXIS 31625 (Nov. 16, 1993)(unpub. op.); Whitehead v. Bradley Univ., 1993 7th Cir. LEXIS 33402 (Dec. 21, 1993(unpub. op.); Whitehead v. Bradley Univ., 1995 7th Cir. LEXIS 9119 (Mar. 27, 1995)(unpub. op.); and Whitehead v. Bradley Univ., 52 F.3d 329 (7th Cir. 1995).

[108] Whitehead v. Bradley Univ., 1991 D.D.C. LEXIS 1224 at *2 (Penn, J.).

[109] *Id.* According to the latest published demographic data from the U.S. Census Bureau, however, Peoria has a total minority population of 31.7%, including 24.8% African-American – which is over twice the Black population percentage (12.3%) of the nation as a whole. *See* "Illinois Quick Facts" at <http://quickfacts.census.gov/qfd/states/17/1759000.html >. *Cf.* the Webster-CIA suit in nn.16 & 25, *ante.*

[110] Whitehead v. Bradley Univ., 1993 7th Cir. LEXIS 31625 at *4-*5 (Cummings, Cudahy and Easterbrook, J. J). Whitehead's usual motion for reconsideration was also promptly denied. Whitehead v. Bradley Univ., 1991 7th Cir. LEXIS 33402 (Dec. 21, 1993).

-27-

Undaunted, Whitehead, filed a "successive appeal," which was summarily denied[111] – but with another early and ominous admonition to him that "[h]e must understand that continuing to abide by the court's decision may lead to the award of sanctions under Fed. R. Civ. P. 11 and Fed. R. App. P. 38." [112]

Thus, at the end of nine years of litigation Whitehead did not have a thing to show for his efforts (except for the admonition to cease pursuing vexatious litigation) – and neither did the students and faculty of Bradley University.[113]

### F. Various *Et Al*'s

Like the Abbot of Citeaux in the Albigensian Crusade, Whitehead has been virtually indiscriminate in his one-man holy litigation war.[114] In 1992, he filed a federal lawsuit for unspecified relief against Dr. Franklyn G. Jenifer, then President of Howard University which, apparently, went nowhere in a hurry; when

---

[111] Whitehead v. Bradley Univ., 42 F.3d 329 (7th Cir., 1995).

[112] Whitehead v. Bradley Univ., 1993 7th Cir. LEXIS 9119 at *2 (citation omitted). Apparently, Whitehead had also generated yet another collateral suit against the University at the state court level, which had been ongoing at the same time. The outcome of that case is unreported, except for a published denial of Whitehead's request for leave to appeal to the Illinois Supreme Court – indicating, presumably, that he had lost that suit as well. *See* Whitehead v. Bradley Univ., 714 N.E.2d 533 (Ill. 1999)

[113] One wonders how many deserving students might have attended the University on the funds the school was forced to expend to resist these patently specious claims against it. This much is certain, though: These unfortunate young people, whoever they were and whatever, if anything, any of them said about Mr. Whitehead, will have to spend the rest of their lives filling about applications for everything from jobs, to credit cards, to security clearances, giving a lengthy explanatory answer to the generic question, "Have you ever been the subject of any major civil lawsuit?" – all thanks to Whitehead's twisted sense of rectitude.

[114] In the Catholic Church's "ethnic cleansing" drive to force the Muslim Moors from Spain back into Northern Africa during the early 13th Century, the Abbot rode ahead of the Spanish troops at the Battle of Beziers (1209), urging the slaughter of everyone in sight, crying, "*Caedite eos! Novit enim Dominus qui sunt eius!*"("Slay them all! God will know his own.").